Filed 5/1/14

# IN THE SUPREME COURT OF CALIFORNIA

KIMBERLY LOEFFLER et al., )
)
      Plaintiffs and Appellants, )
)       S173972
v. )
)       Ct.App. 2/3 B199287
TARGET CORPORATION, )
)       Los Angeles County
      Defendant and Respondent. )    Super. Ct. No. BC360004
_____)

Plaintiffs are consumers who contend that defendant retailer represented that it properly was charging and in fact charged them sales tax reimbursement on sales of hot coffee sold "to go," when, according to plaintiffs, the tax code rendered such sales exempt from sales tax. They brought an action against defendant retailer under two consumer protection statutes, seeking a refund of the assertedly unlawful charges, damages, and an injunction forbidding collection of sales tax reimbursement for such sales. The trial court sustained defendant's demurrer without leave to amend, and the Court of Appeal affirmed, concluding that plaintiffs' action was not authorized under the tax code and was barred by article XIII, section 32 of the California Constitution. That provision limits the manner in which taxpayers may seek a refund of taxes from the taxing entity.

We affirm the judgment of the Court of Appeal, although our analysis differs somewhat from that court's analysis. We conclude that the tax code provides the exclusive means by which plaintiffs' dispute over the taxability of a retail sale may be resolved and that their current lawsuit is inconsistent with tax

1

code procedures. As explained, the consumer protection statutes under which plaintiffs brought their action cannot be employed to avoid the limitations and procedures set out by the Revenue and Taxation Code.[1]

## I. FACTS AND PROCEEDINGS BELOW

### A. Proceedings and arguments in the trial court

Plaintiffs' first amended complaint alleged that defendant Target Corporation (Target)[2] had committed an unfair business practice as defined by the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.) and an unlawful practice in violation of the Consumer Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.). The complaint also alleged a cause of action for violation of section 6359, a provision exempting many food sales from sales tax. Plaintiffs sought class certification.[3]

---

[1] Unless otherwise noted, statutory references are to the Revenue and Taxation Code (hereafter sometimes referred to as the tax code or the tax law).

[2] Like the Court of Appeal, we refer to defendant in the singular although the first and second amended complaints named 100 "Doe" defendants as parties. We note that in stating the allegations, plaintiffs' complaint is inconsistent in its usage.

[3] The first amended complaint also alleged claims for money had and received, conversion, and negligent misrepresentation. At the hearing on defendant's demurrer to the first amended complaint, plaintiffs agreed that the court should sustain the demurrer without leave to amend as to these three counts, and the court did so. Plaintiffs nonetheless appealed from the trial court order sustaining the demurrer to the first amended complaint as to these three causes of action. In their opening brief in the Court of Appeal, plaintiffs stated that they were "not appealing" the trial court's ruling with respect to the conversion and negligent misrepresentation causes of action. The Court of Appeal concluded the trial court correctly sustained the demurrer to the money had and received claim. Plaintiffs did not specifically challenge this conclusion in their petition for review and it is not discussed in this opinion.

Plaintiffs alleged that "the sale of hot coffee drinks 'to go' or for 'take-out' is not subject to sales tax" under section 6359 and a related regulation adopted by the state Board of Equalization (Board). They alleged that defendant nonetheless charged what the complaint referred to as "sales tax" on purchases of hot coffee to go to two named plaintiffs, and "thus caused [plaintiffs] to suffer monetary loss." (As we shall see, the complaint is inaccurate to the extent it refers to plaintiffs' payment to the retailer as "sales tax." The tax code provides that the *retailer* is the taxpayer and that it is the retailer which is required to pay sales tax to the state; the retailer is permitted but not required to collect a matching "sales tax reimbursement" from consumers. It is the reimbursement charge that is at issue in the present case.)

Plaintiffs also alleged that "[defendant] falsely and illegally represented to members of the general public that it had the legal right to charge the sales taxes described herein including, but not limited to, oral representations made by [its] agents, and on receipts and registers at [its] facilities."

Plaintiffs alleged that defendant's actions constituted "unlawful, unfair and fraudulent business acts and practices within the meaning of . . . Business and Professions Code section 17200, et seq." It was further alleged that "[b]y [its] actions, [defendant] unfairly and unlawfully increased the costs to Class members in direct contradiction to law. In the event [defendant] retained these monies it unjustly enriched itself at the expense of Plaintiffs, other Class members and the general public and, as such, [defendant's] conduct amounts to unfair competition" and "offends public policy and is immoral, unscrupulous, unethical and offensive, and causes substantial injury." The complaint alleged continuing violations and asserted that defendant "refused to publicly acknowledge [its] improper imposition of the charges, correct [its] wrongdoing, and provide compensation . . . ."

Plaintiffs sought an order enjoining defendant from "improperly charging sales tax to consumers" on hot coffee to go, and from withholding information regarding its practices. Plaintiffs also sought "restitution of any monies wrongfully acquired or retained" and "disgorgement of . . . ill-gotten gains obtained by means of . . . unfair practices."

Plaintiffs alleged a violation of the CLRA in that defendant "(a) misrepresented the source, sponsorship, approval or certification of [its] charges for sales taxes by indicating to consumers that [it has] . . . the legal authority to charge the sales taxes that [it has] . . . charged and continue[s] to charge"; (b) "[misrepresented the] affiliation, connection, or association with, or certification by, another by indicating to consumers that [it has] . . . the legal authority to charge the sales taxes . . . ; [misrepresented that] the transactions at issue confer or involve rights, remedies, or obligations which [it does] not have or involve, or which are prohibited by law by charging the sales tax"; and inserted an unconscionable provision into contracts by charging the assertedly improper "sales tax."

Plaintiffs alleged that they had informed defendant by mail of its alleged violation of the CLRA and made a "demand for remedy," but that no remedy has been forthcoming.

Plaintiffs sought an order "enjoining the [defendant] from continuing the methods, acts and practices set out above regarding [its] charging of illegal sales taxes . . . ." They sought damages in "the amount of sales taxes wrongfully collected from plaintiffs and the Class for the purchase of hot coffee 'to go' or for 'take out,' without being limited thereto" and punitive damages on the ground that "[defendant's] conduct allegedly was willful, oppressive and fraudulent."

Finally, plaintiffs sought an order certifying the class, awarding restitution and disgorgement, enjoining the continuation of "illegal practices," requiring

4

defendant to "inform the public of [its] unlawful practices and enjoining [defendant] from the practices complained of."

Defendant demurred. It objected that plaintiffs' action would call upon the court to order a refund and enjoin collection of the sales tax reimbursement "on the allegedly non-taxable items" "without a determination that Target erroneously paid the tax to the [Board]." Defendant argued that article XIII, section 32 of the state Constitution barred such a proceeding because plaintiffs' lawsuit sought, in effect, "an order preventing the [Board] from collecting this tax" and "remedies not provided for" in the tax code.

Defendant also argued that consumer remedies regarding sales taxes should be permitted only as specifically provided by the Legislature, asserting that the Board is responsible in the first instance for deciding whether retailers have collected too much sales tax reimbursement from consumers.

In addition, defendant argued that the court should decline to exercise jurisdiction over plaintiffs' claims, but should defer to the Board under the doctrine of primary jurisdiction.

Plaintiffs responded that at the demurrer stage, there was no record of whether Target paid the sales tax it collected to the Board, nor need there be any such allegation in the complaint. Plaintiffs argued that the Legislature had specifically provided that they "may sue Target for illegally charging them sales tax," alluding in support to section 6901.5 and a decision of this court interpreting a predecessor to that statute, *Javor v. State Board of Equalization* (1974) 12 Cal.3d 790 (*Javor*). Section 6901.5, they asserted, afforded them a private right of action "against those who charge them improper sales taxes."

Plaintiffs further asserted that the state constitutional limitation on lawsuits for tax refunds (Cal. Const., art. XIII, § 32) did not apply, and that the doctrine of primary jurisdiction should not apply.

5

As for their UCL claim, plaintiffs argued that even if the tax code provided no private right of action, the UCL supplied a basis for their claim. They alleged that violation of section 6359 (exempting many food sales from sales tax), and the statute's related regulation, is "unlawful" and therefore supports their UCL claim.

At the hearing on the demurrer, the trial court observed that "a determination has to be made by the [Board] regarding [any] . . . 'refund' . . . or 'damages'. . . pursuant to sections 6901 [governing refunds from the Board to retailers] and 6901.5 [governing the return of excess reimbursement from consumers]." It added: "If the [Board] makes a determination, then the case or these causes of action might be ripe for adjudication."

In response, plaintiffs requested leave to amend the complaint to "bring in the Board and then proceed in that manner." There was some discussion of an amendment that would constitute a suit to compel defendant to seek a refund from the Board, but the court warned, "I'm not going to be creative for you. I'm going to allow you to try to amend the first three causes of action to see what we get out of it." The court sustained the demurrer with leave to amend as to the three causes of action discussed above, formally granted plaintiffs' motion for leave to add the Board as a defendant, and sustained the demurrer without leave to amend as to the money had and received, conversion, and negligent misrepresentation causes of action.

Plaintiffs filed a second amended complaint, but this complaint did *not* add the Board as a defendant. Their amended complaint simply added a few details concerning plaintiffs' purchases, and alleged that defendant Target never inquired whether the named plaintiffs' coffee purchases were to go, thereby depriving plaintiffs of the "opportunity to avoid being wrongfully charged the taxes at issue."

6

Defendant once more demurred, repeating that the remedies plaintiffs sought were unavailable under the state Constitution because the injunctive remedy essentially would prevent the Board from collecting the tax, and a restitution award would afford tax relief in a manner not established by the Legislature. Defendant maintained that section 6901.5, a provision that governs reimbursement refunds, does not create a private right of action for consumers, but instead contemplates that consumers should apply to the Board to, in the words of the statute, "ascertain[]" whether retailers should make any refund to consumers. Defendant also repeated its assertion that the court should decline to exercise its equitable power under the doctrine of primary jurisdiction.

At the hearing on the demurrer, the trial court commented that the second amended complaint was "déjà vu all over again." The court explained that the question whether plaintiffs were appropriate "complainants" had not been answered and stated that "[n]either the statutory [scheme] nor any case authority allows you to go forward with this type of action unless there's been, at the very least — and I don't have an opinion about this — some request to the tax court . . . ."

Plaintiffs responded first that "regardless of whether the . . . [Board] should be involved, the representation by [defendant] to its customers that they are paying a sales tax when in fact, they are not is an unfair business practice." Second, plaintiffs disputed the significance of the question of the Board's "jurisdiction over this claim." Plaintiffs asserted that the court had assumed that defendant had paid the Board sales tax on sales of hot coffee, but "the complaint doesn't allege that" and it is wrong for the "court [to] make that assumption." Third, counsel for plaintiffs stated that "what some courts have done in this circumstance that I've been involved with is that they stay the case, advise us to go seek the refund from

7

the [Board], and inevitably when that answer is 'no,' we can come back and then we are allowed to go forward with our case."

Defendant countered that plaintiffs had chosen the wrong way to go about their claim, and objected to the idea of staying the case, permitting plaintiffs to seek reimbursement from the Board, then returning to court. On the contrary, defendant argued, plaintiffs may do no more than was authorized in our *Javor* decision (see *Javor*, *supra*, 12 Cal.3d 790), in which we permitted consumers to bring an action to require retailers to seek a sales tax refund from the Board. Defendant emphasized that plaintiffs had exhibited no interest in taking such a course.

The court sustained the demurrer to the second amended complaint without leave to amend and dismissed the case with prejudice, stating that it agreed with "much" of defendant's argument and written pleadings.

### B. Arguments on appeal, and the Court of Appeal's decision

Plaintiffs appealed, contending primarily that section 6901.5 afforded them a private right of action against defendant. Despite their concession at the hearing on the first amended complaint that the demurrer should be sustained without leave to amend as to the cause of action for money had and received, they also contended they had adequately pleaded that cause of action.

In response, defendant contended that the suit was barred by the California Constitution, and that section 6901.5 does not provide for a private right of action. It also disputed plaintiffs' claim concerning the money had and received count.

In reply, plaintiffs denied that article XIII, section 32 of the state Constitution applied to their suit, insisted that the language of section 6901.5 authorized their lawsuit, and argued that even if a Board determination was a prerequisite to their suit, the trial court should have stayed the action under the doctrine of primary jurisdiction.

8

The Court of Appeal affirmed the judgment in favor of defendant.  It rejected plaintiffs' claim that the tax code itself afforded them a private right of action against retailers, and concluded that their UCL and CLRA claims were inconsistent with article XIII, section 32 of the state Constitution.

The Court of Appeal pointed to the tax code's comprehensive sales tax scheme and its intertwining provisions governing retailers.  It emphasized that it is *retailers* who pay sales tax to the state, and that under the tax code, it is retailers who may file a claim with the Board seeking a refund of overpaid sales tax.  Customers, the court pointed out, lack standing to file a claim with the Board for a tax refund.  The Court of Appeal rejected plaintiffs' reliance upon section 6901.5 as a basis for a private right of action against the retailer.  It declared that the statute makes some provision for the refund of excess tax reimbursement amounts to consumers, but the statute and related regulation do not provide a private right of action for consumers.  On the contrary, the reviewing court declared that nothing in section 6901.5 "affirmatively indicates the intent of the Legislature to authorize a private action by a customer against a retailer. . . .  Rather, the statute relates to a *claim* with the Board"— not a lawsuit — and the statute and related regulation direct a retailer to make a refund to customers if the *Board* has " 'ascertained' " that one is due.

The Court of Appeal believed that the Legislature has vested in the Board the authority to enforce the sales tax law, and that it would undermine the statutory scheme to permit customers to unilaterally " 'ascertain' " when excess sales tax reimbursement had been collected.  The court stated that plaintiffs' contrary claim "would disrupt the administration of the sales tax laws because it would allow customers to usurp the authority of the Board to determine the application of the law in the first instance."  The reviewing court pointed out that the Board has not had an opportunity to ascertain whether sales tax was due on defendant's sale of

9

hot coffee to go, nor has it ascertained whether any reimbursement is due under section 6901.5.

Moreover, according to the Court of Appeal, plaintiffs are trying to use the UCL and CLRA to resolve a sales tax dispute, but "[t]his they cannot do under article XIII, section 32" of the state Constitution. In the appellate court's view, constitutional restrictions would not permit a consumer action seeking to declare a particular sale exempt from tax, because a resulting award in favor of consumers could afford a tax refund in a manner not specifically authorized by the Legislature. The court also believed that constitutional principles would not permit an injunction against defendant's collection of sales tax reimbursement, because such an injunction could curtail tax collections.

The Court of Appeal summarized its constitutional analysis and holding as follows: "Article XIII, section 32 prohibits injunctions against the collection of state taxes and provides that refunds of taxes may only be recovered in a manner provided by the Legislature. As our Supreme Court explained in *Woosley v. State of California* (1992) 3 Cal.4th 758, 792 (*Woosley*), under article XIII, section 32, the courts cannot expand the methods for seeking tax refunds expressly provided by the Legislature. The purpose of this constitutional provision is to ensure that governmental entities may engage in fiscal planning so that essential public services are not unnecessarily interrupted. [¶] . . . [¶]

"The complaint also alleges causes of action under unfair business practices and consumer protection statutes and a cause of action for money had and received. Plaintiffs seek damages, restitution and injunctive relief pursuant to these causes of action. However, plaintiffs are attempting to resolve a sales tax dispute by using consumer and common law remedies rather than the procedure set forth by the Legislature. This they cannot do under article XIII, section 32.

10

"Plaintiffs argue that they are not violating article XIII, section 32, because they do not seek to enjoin the state from collecting sales taxes. Rather, plaintiffs contend, they seek to enjoin a private company from collecting sales tax reimbursement. Plaintiffs further contend that article XIII, section 32 is not implicated because they only seek a refund of sales tax reimbursement, not a refund of sales taxes.

"We reject plaintiffs' argument and find that a court may not *directly or indirectly* enjoin or prevent the collection of a sales tax. As we will explain, the statutory schemes for sales taxes and sales tax reimbursement are intertwined. A determination by a court that sales tax is not due on 'to go' hot coffee purchases from Target, and an injunction against the collection of sales tax reimbursement by Target on such purchases, is effectively an injunction against the collection of sales tax by the state. Further, under article XIII, section 32, plaintiffs cannot circumvent the statutory scheme for sales tax reimbursement refunds by asserting causes of action not contemplated by that scheme. We therefore affirm the judgment and hold that plaintiffs' action is barred by article XIII, section 32 and the sales tax statutes in the Revenue and Taxation Code."

### C. Parties' claims

We granted plaintiffs' petition for review. Plaintiffs challenge the Court of Appeal's constitutional analysis, and contend that UCL and CLRA remedies are cumulative to any remedy or procedure that is available under the tax code. Plaintiffs have now stated that they do *not* challenge that part of the Court of Appeal's decision rejecting their own claim in that court that the tax code, and specifically section 6901.5, provided them with a private right of action against defendant. On the contrary, in this court plaintiffs argue that the *absence* of a private right of action for consumers under the tax code makes it imperative that this court recognize their remedies under the UCL and CLRA. They contend, too,

11

that the Court of Appeal's decision would undermine UCL and CLRA actions in general and would leave consumers who are charged unauthorized or excessive sales tax without a remedy.

Defendant contends that the Court of Appeal correctly analyzed the constitutional and statutory provisions and properly concluded that plaintiffs' action is barred.

## II.  DISCUSSION

On appeal, "[w]hen a demurrer [has been] sustained, we determine whether the complaint states facts sufficient to constitute a cause of action.  [Citation.] And when it is sustained without leave to amend, we decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse." (*City of Dinuba v. County of Tulare* (2007) 41 Cal.4th 859, 865; see Code Civ. Proc., § 430.10, subd. (e).)  We follow the well-settled rule that "[w]hen reviewing a judgment dismissing a complaint after the granting of a demurrer without leave to amend, courts must assume the truth of the complaint's properly pleaded or implied factual allegations." (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.) On the other hand, the reviewing court "does not . . . assume the truth of contentions, deductions or conclusions of law." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967.)

We summarize our conclusions, which depend upon a proper understanding of both the procedural and substantive aspects of the governing sales tax provisions.  The clear basis of plaintiffs' action — that Target represented that it properly was charging and in fact charged sales tax reimbursement on a sale that plaintiffs believe the tax code exempted from taxation — requires resolution of a sales tax law question, that is, whether Target's sales of hot coffee to go to plaintiffs were subject to sales tax or fell within an exemption.  That question,

12

which we may characterize as the "taxability" question, is committed in the first instance to the Board, subject to judicial review under the restrictions and pursuant to the procedures provided by the tax code. A UCL or CLRA cause of action such as plaintiffs' cannot be reconciled with the primary decisionmaking role that the tax code vests in the Board with respect to tax issues. Moreover, section 6901.5 provides a safe harbor for a retailer/taxpayer who remits reimbursement charges to the Board. For these reasons, the tax code precludes claims such as plaintiffs'.

Although in the past we have permitted consumer intervention into the sales tax scheme in limited circumstances and only by means of a judicial proceeding to compel the retailer/taxpayer to seek a refund from the Board (see *Javor*, *supra*, 12 Cal.3d 790), such a remedy invokes, rather than avoids, tax code procedures. Plaintiffs in the present case did not pursue that remedy.

Because we can resolve the issues presented on statutory grounds, it is not necessary to resolve the constitutional question addressed by the Court of Appeal, although constitutional considerations enter into our interpretation of the relevant statutes.[4]

### A. Article XIII, section 32 of the state Constitution

The Court of Appeal's determination that plaintiffs' claims were barred rested in large part upon article XIII, section 32 of the state Constitution: "No legal or equitable process shall issue in any proceeding in any court against this State or any officer thereof to prevent or enjoin the collection of any tax. After

---

[4]     We express no view on a question not presented by the complaint in this case, namely, whether or to what extent consumers may bring a UCL or CLRA claim against retailers for failing to remit to the Board amounts the retailer has represented and collected as sales tax reimbursement charges. In their supplemental briefs, plaintiffs have acknowledged that their lawsuit does not rest on such a claim.

13

payment of a tax claimed to be illegal, an action may be maintained to recover the tax paid, with interest, in such manner as may be provided by the Legislature." (All further article references are to the California Constitution.)

We have explained that the policy behind the provision is to ensure that the State may continue to collect tax revenue during litigation in order to avoid unnecessary disruption of public services that are dependent on that revenue. (*Pacific Gas & Electric Co. v. State Bd. of Equalization* (1980) 27 Cal.3d 277 (*Pacific Gas & Electric Co.*).) We have observed that delay in tax collection " 'may derange the operations of government, and thereby cause serious detriment to the public.' " (*Id*. at p. 283.) To serve the same end, the constitutional provision not only bars prepayment actions by taxpayers seeking injunctive relief but ordinarily also bars those seeking declaratory relief or mandamus. (*Id*. at pp. 280-281; *Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 838; *State Bd. of Equalization v. Superior Court* (1985) 39 Cal.3d 633, 638-639 ["[T]he sole legal avenue for resolving tax disputes is a postpayment refund action. A taxpayer may not go into court and obtain adjudication of the validity of a tax which is due but not yet paid"; the constitutional provision prohibits "not only injunctions but also a variety of prepayment judicial declarations or findings which would impede the prompt collection of a tax"].) In sum, "[t]he section applies if the prepayment judicial determination sought would impede tax collection." (*Western Oil & Gas Assn. v. State Bd. of Equalization* (1987) 44 Cal.3d 208, 213 (*Western Oil & Gas Assn.*).)

Article XIII, section 32 also requires that tax refund actions be brought solely according to *procedures* established by the Legislature. It vests power over tax procedure in the Legislature, and limits or governs the authority of the courts over tax collection disputes. (*Western Oil & Gas Assn.*, *supra*, 44 Cal.3d at p. 213 [the provision "broadly limits in the first instance the power of the courts to

14

intervene in tax collection matters"].)  This deference also serves the state's interest in being able to plan for needed public expenditures, and "rests on the premise that strict legislative control over the manner in which tax refunds may be sought is necessary so that governmental entities may engage in fiscal planning based on expected tax revenues."  (*Woosley*, *supra*, 3 Cal.4th at p. 789; see *Pacific Gas & Electric Co.*, *supra*, 27 Cal.3d at p. 283.)

Plaintiffs argue that article XIII, section 32 does not apply to or bar their lawsuit because the provision applies solely (1) to actions against the *state* or its officers; and (2) to lawsuits brought by *taxpayers*; (3) to recover the *tax* paid. Plaintiffs observe that their action for restitution, damages, and injunctive relief is not against the state, or indeed any government taxing entity.  They add that the reimbursement amount they challenge is not a tax, but an amount they, as nontaxpayers, paid to retailers pursuant to a contractual arrangement.  They claim, moreover, that their action will not impair the state's ability to collect taxes, nor will the action recognize a refund procedure that is inconsistent with the tax code.

In response, defendant maintains that under the state Constitution, tax refund issues may be litigated solely according to the procedure specifically provided by the tax code, and that plaintiffs' lawsuit is inconsistent with that scheme.  Defendant observes that the constitutional provision prohibits lawsuits to prevent or enjoin the collection of any tax, and argues that "because an action to recover sales tax reimbursement is substantively indistinguishable from an action to recover the tax paid, this constitutional protection must be afforded to retailers collecting sales tax reimbursement from their customers."

Our jurisprudence directs that we avoid resolving constitutional questions if the issue may be resolved on narrower grounds (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 230), and that we adopt an interpretation of the relevant statutes that gives full effect to their

language and purpose, but also "eliminates doubts as to the statute's constitutionality." (*Harrott v. County of Kings* (2001) 25 Cal.4th 1138, 1151; see *Conservatorship of Wendland* (2001) 26 Cal.4th 519, 548.)

As already noted, and applying this authority, our interpretation of the tax code renders it unnecessary to resolve the constitutional question addressed by the Court of Appeal, although constitutional considerations enter into our interpretation of the relevant statutes.

**B. Overview of relevant provisions of the tax law**

As noted previously and as discussed more fully hereafter, under California's sales tax law, the taxpayer is the retailer, not the consumer. In addition, the taxability question, whether a particular sale is subject to or is exempt from sales tax, is exceedingly closely regulated, complex, and highly technical. A comprehensive administrative scheme is provided to resolve these and other tax questions and to govern disputes between the taxpayer and the Board. Under these administrative procedures, it is for the Board in the first instance to interpret and administer an intensely detailed and fact-specific sales tax system governing an enormous universe of transactions. Administrative procedures must be exhausted before the taxpayer may resort to court. Parts II.B.1. and II.B.2. below describe the system in more detail, supporting the view that this comprehensive statutory scheme is inconsistent with consumer claims such as plaintiffs' by which a party other than the taxpayer would seek to litigate whether a sale is taxable or exempt.

As for the interests of consumers, parts II.B.3. and II.B.4. describe the position historically accorded to them by statute and case law, and also set out the current statutory system governing consumer reimbursements. More specifically, retailer/taxpayers are permitted, but not required, to contract with consumers to charge a reimbursement amount to reimburse the retailer for its own payment of sales tax on a transaction. Alternatively, the retailer may choose simply to absorb

16

the sales tax. Retailer/taxpayers cannot retain the reimbursement amounts they receive from consumers. When it is "ascertained" (§ 6901.5), whether through a Board audit or deficiency determination or a refund proceeding, that a retailer miscalculated its sales tax and charged consumers an erroneous reimbursement amount, the retailer has a choice whether to make a refund to consumers or instead, to remit the amount to the Board. Significantly, a retailer who remits the amount to the Board reaches a "safe harbor." In addition, there is no formal administrative procedure for consumers who believe they have been charged excess reimbursement, although they may complain to the Board, which may in turn initiate an audit. Finally, we have recognized that in certain circumstances a consumer may bring an action to require a taxpayer to seek a refund from the Board, a proceeding in which the Board would ascertain whether excess reimbursement had been charged and, assuming any excess had been remitted by the taxpayer to the state, issue a refund to the taxpayer conditioned on its, in turn, making a refund to the consumer.

As we shall explain, it would be inconsistent with this scheme to permit the consumer to initiate a consumer action such as plaintiffs' requiring a court to resolve, outside the searching regulatory scheme established by the tax code, whether a sale was taxable or exempt, and for the court to interfere in the statutory system by which the retailer is authorized to satisfy its obligations by remitting excess tax reimbursement amounts to the Board.

*1. Who is the taxpayer and what sales are taxable?*

The sales tax is imposed on retailers "[f]or the privilege of selling tangible personal property at retail." (§ 6051.) The *retailer* is the taxpayer, *not* the

17

consumer.[5]  "The tax relationship is between the retailer only and the state; and is a direct obligation of the former."  (*Livingston Rock & Gravel Co. v. De Salvo* (1955) 136 Cal.App.2d 156, 160; see also 9 Witkin, Summary of Cal. Law (10th ed. 2005) Taxation, § 344, p. 497; 56 Cal.Jur.3d (2011) Sales and Use Taxes, § 10, p. 22.)

The sales tax law provides the method by which retailers are required to calculate taxable sales and remit the tax to the Board.  Retailers must file returns and pay sales tax quarterly on their gross sales for the preceding quarter. (§§ 6451-6459.)  For high volume sellers, the tax or a portion thereof must be prepaid on a quarterly basis using a portion of prior year sales tax liability as a measure.  (§§ 6471-6479; 9 Witkin, Summary of Cal. Law, *supra*, Taxation, § 369, p. 541.)

The central principle of the sales tax is that retail sellers are subject to a tax on their "gross receipts" derived from retail "sale" of tangible personal property. (§ 6051.)

Despite the apparent simplicity of a tax based on gross receipts, a complex system of statutes and regulations minutely controls tax liability.  This system closely defines taxable sales,[6] governs whether particular sales or transactions are subject to the tax, and defines what constitutes "gross receipts."[7]

---

[5]      By contrast, the use tax falls on the purchaser, although the retailer may collect the tax as an agent.  (§§ 6202, 6203; *Bank of America v. State Bd. of Equal.* (1962) 209 Cal.App.2d 780, 799; see also *Direct Marketing Ass'n, Inc. v. Bennett* (9th Cir. 1990) 916 F.2d 1451, 1454-1455.)

[6]      The term "sale" means "[a]ny transfer of title or possession, exchange, or barter, conditional or otherwise, in any manner or by any means whatsoever, of tangible personal property for a consideration."  (§ 6006, subd. (a).)  The term is defined as including many specific transactions, including "[t]he furnishing,

*(footnote continued on next page)*

Of particular note given plaintiffs' argument that consumer claims should lie when the retailer fails to correctly apply sales tax exemption law, an entire chapter of the sales and use tax law is devoted to exemptions.  (§ 6351 et seq.)  The law of exemptions is comprehensive, governing every imaginable type of

*(footnote continued from previous page)*

preparing, or serving for a consideration of food, meals, or drinks." (§ 6006, subd. (d).)

An example illustrates the statutory refinements to the term "sale" that face the taxpayer and the Board.  Leases of tangible personal property for a consideration are included as sales, with some readily understood exceptions, such as leases of motion pictures or household furnishings leased along with living quarters (§ 6006, subd. (g)(1), (3)), and a host of other exceptions for a number of closely defined circumstances.  These include "[t]angible personal property leased in substantially the same form as acquired by the lessor or leased in substantially the same form as acquired by a transferor, as to which the lessor or transferor has paid sales tax reimbursement or has paid use tax measured by the purchase price of the property," with the term "transferor" including "[a] person from whom the lessor acquired the property in a transaction described [by another statute as an occasional sale]," or " [a] decedent from whom the lessor acquired the property by will or the laws of succession." (§ 6006, subd. (g)(5); see *Preston v. State Bd. of Equalization* (2001) 25 Cal.4th 197 (*Preston*) [considering whether a certain agreement to provide artwork constituted a taxable sale or lease of tangible personal property or an exempt transfer of an intangible copyright interest].)

[7] "Gross receipts" are defined in pertinent part as "the total amount of the sale . . . price . . . of the retail sales of retailers, valued in money, whether received in money or otherwise," generally without deduction for the cost of the property, or the cost of materials, labor, transportation, or certain federal taxes.  (§ 6012, subd. (a).)

Again, to illustrate the complexity facing the taxpayer and the Board, the crucial term "gross receipts" is subject to detailed refinement, and the limitation on deductions or exclusions from gross receipts is subject to a number of exceptions, from readily understood circumstances such as cash discounts given on sales, or the amount refunded to customers for items returned by the customer (see § 6012, subd. (c)(1), (2)), to a number of other circumstances subject to detailed conditions defined in terms of the "reasonableness" of the charge.  (See § 6012, subd. (c)(10)(A); see also *id*., subd. (c)(7).)  The term "sales price" contains parallel complications.  (See § 6011.)

sales transactions. One article in the exemption chapter includes 79 provisions exempting particular types of transactions from sales and use taxation — including, for example, relatively straightforward exemptions for poultry litter (§ 6358.2), to much more complicated and fact-specific exemptions for some sales of food or medicine (§§ 6359, 6369) or for gross receipts from food stamp sales (§ 6373), to some quite arcane exemptions. (See § 6366.5 [sales of endangered species].) Many exemptions apply to various types of charitable or nonprofit transactions. (See § 6360.1 [sales of veteran's memorial lapel pins]; see also §§ 6359.3, 6361, 6361.5, 6363.2-6363.8.) Some of the exemptions turn on the use to which the purchaser will put the item being sold or leased (see §§ 6366.4 [artwork sold to nonprofit museums for the purpose of public display], 6368.1 [leasing of watercraft for specified purposes]), and in some instances, the law exempts transactions from only a small portion of the sales tax. (See § 6376.1.)

In this case, plaintiffs assert that the sales tax law plainly exempts the sale of hot coffee to go from sales tax, and that Target violated the UCL and CLRA by collecting reimbursement on an assertedly nontaxable sale. Plaintiffs refer to section 6359, which generally exempts the "sale of . . . use, or other consumption" of food products. (§ 6359, subd. (a).)

There are many exceptions to the exemption appearing in section 6359, however. Food products are not exempt if they are "served as meals on or off the premises." (*Id*., subd. (d)(1).) Also not qualifying for the exemption are items that are "furnished, prepared, or served for consumption at tables, chairs, or counters or from trays, glasses, dishes, or other tableware" provided by the retailer. (*Id*., subd. (d)(2).) In other words, a distinction is drawn between items of food depending on whether they are consumed on the premises. The exemption also does not apply when "foods products are sold as hot prepared food products." (*Id*., subd. (d)(7).) On the other hand, the " 'hot prepared food products' "

20

exception to the exemption does not apply "to a sale for a separate price of bakery goods or beverages (other than bouillon, consommé, or soup)" under defined conditions. (*Id*., subd. (e).)

Accompanying regulations descend to the finest details. (See Cal. Code Regs., tit. 18, § 1602 et seq.) The regulation defining the taxability of food products is of amazing complexity. (*Id*., § 1603.) The regulation applies the tax to sales of hot prepared foods (a term subject to very extensive refinement and somewhat contradictory definition (see *id*., § 1603, subd. (e)), with provisions for items furnished by specified establishments "whether served on or off the premises." (*Id*., § 1603, subd. (a)(2)(A).) There are special rules for sales of straws and toothpicks along with food (*ibid*.), and a definition of "hot prepared food products" that distinguishes between items sold separately and those sold under a single price along with cold foods (*id*., subd. (e)(1)), which appears to exempt hot coffee if sold separately but not if sold with a bakery item, unless taxable because, among other reasons, it was sold for consumption at tables, chairs, or counters provided by the retailer. (*Id*., § 1603, subds. (e), (f).)

In an amicus curiae brief filed in this court, the Board explains that "to go" sales are those for which the customer leaves the store's premises entirely before consuming the item. "Target would have to distinguish sales of coffee where the customer bought the coffee and immediately left the store from those where the customer bought the coffee but continued to shop in the same store or drank the coffee at tables and chairs in the coffee sales area. In addition, since the analysis must be made on a location-by-location basis, Target would need to conduct investigations in each of its California locations. [Citation.] The amount of administrative expense incurred to obtain such figures and maintain proper records would likely be passed on to Target's customers in the form of higher prices."

21

Putting aside fine points concerning the application of the law, and returning to the general provisions of the tax law, it is *presumed* that all "gross receipts" are subject to the sales tax unless the contrary is established by the retailer. (§ 6091.) This presumption exists in order to ensure "the proper administration of [the sales tax law] and to prevent evasion of the sales tax . . . ." (*Ibid.*) Taxpayers' exemption claims must be supported by adequate records. (*Paine v. State Bd. of Equalization* (1982) 137 Cal.App.3d 438, 443 (*Paine*).) The burden of proof is on the taxpayer. (*Southern California Edison Co. v. State Bd. of Equalization* (1972) 7 Cal.3d 652, 663 (*Southern California Edison*); *People v. Schwartz* (1947) 31 Cal.2d 59, 64 (*Schwartz*).)

2. *Board jurisdiction over enforcement and tax challenges*

The Board administers and enforces the sales tax law (§§ 7051-7060), and adopts related regulations. (§ 7051.) It may audit taxpayers (§ 7054) and may require them to file reports relating to their sales. (§ 7055.) The Board, if not satisfied with the return or amount of tax paid, may make deficiency determinations (§ 6481), and impose penalties (§§ 6484, 6485), and may offset overpayments for one period against underpayments for another period or against penalties and interest. (§§ 6483, 6512.) The law provides the method by which retailers may challenge deficiency determinations made by the Board. (§§ 6561-6566.)

Various rules govern the Board's ability to file tax liens, undertake court actions, and execute judgments against taxpayers. (§§ 6701-6798.) The Board generally has three years from the time taxes are due or remitted to give notice of deficiency, but has eight years to act if no return is filed. (§ 6487, subd. (a).)

Taxpayers may file refund claims with the Board. (§ 6901 et seq.) Taxpayers seeking a refund must first pay the tax; they may not deduct the disputed amount from their quarterly payments pending determination of the

22

refund claim. (Cal. Code Regs., tit. 18, § 5232, subd. (f).) Failure to file a timely refund claim constitutes a waiver of any claim for refund of overpayments. (§ 6905.) When it is determined that the taxpayer is owed a refund, the amount of excess tax payment is credited against amounts then due from the taxpayer. (§ 6901; Cal. Code Regs., tit. 18, § 5238.) The law imposes strict time limits on taxpayers for requests for refund or redetermination. (§§ 6561, 6902.)

Taxpayers are subject to penalty for late or improper returns (§§ 6476-6478, 6591 et seq.), and may be criminally liable for false or fraudulent returns (§ 7152) or other violations of the tax code. (§§ 7153, 7153.5.)

The taxpayer must exhaust administrative remedies before bringing an action in court. As the tax code provides, "[n]o suit or proceeding shall be maintained in any court for the recovery of any amount alleged to have been erroneously or illegally determined or collected unless a claim for refund or credit has been duly filed" pursuant to provisions of the tax code. (§ 6932.)

The tax code also contains a provision that parallels article XIII, section 32 of the state Constitution. It provides that "[n]o injunction or writ of mandate or other legal or equitable process shall issue in any suit, action, or proceeding in any court against this State or against any officer of the State to prevent or enjoin the collection under this part of any tax or any amount of tax required to be collected." (§ 6931.)

We have explained that "[t]he purpose of these statutory requirements is to ensure that the Board receives sufficient notice of the claim and its basis" and to give the Board "an opportunity to correct any mistakes, thereby conserving judicial resources." (*Preston*, *supra*, 25 Cal.4th at p. 206.) The issues raised in the claim for refund establish and restrict the claims that may be raised in any subsequent judicial challenge. (*Ibid*.)

23

### 3. *Sales tax reimbursement*

As for consumers, although the sales tax falls on retailers and must be paid by them to the state, retailers *are permitted but not required* to obtain reimbursement for their tax liability from the consumer at the time of sale. (Civ. Code, § 1656.1; 9 Witkin, Summary of Cal. Law, *supra*, Taxation, § 344, p. 498; 56 Cal.Jur.3d, *supra*, Sales and Use Taxes, § 12, p. 25; 2 State Bd. of Equalization, Business Taxes Law Guide (2009) Sales & Use Tax Annots., Annots. Nos. 460.0020, p. 4760 [retailers are not required to collect reimbursement], 460.0023, p. 4760 [retailers may discount a price by the amount of the sales tax reimbursement], 460.0005, p. 4759 [retailers may advertise a price as free of sales tax].) Whether a reimbursement amount will be added is purely a matter of contract between the retailer and consumer. (Civ. Code, § 1656.1, subd. (a); Cal. Code Regs., tit. 18, § 1700, subd. (a)(1).) It is presumed that the parties agreed to the addition of sales tax reimbursement to the sales price if the sales agreement so states, if the sales tax reimbursement is shown on the sales check, or if the retailer posts a notice or notifies consumers by specified methods that reimbursement for sales tax will be added to the sales price of all items or certain items. (Civ. Code, § 1656.1, subd. (a)(1), (2) & (3); 9 Witkin, Summary of Cal. Law, *supra*, Taxation, § 344, p. 498.)

A retailer who fails to remit to the Board the sales tax reimbursement amount it has knowingly collected from the consumer is subject to a 40 percent penalty (§ 6597, subd. (a)(1) ["Any person who knowingly collects sales tax reimbursement . . . , and who fails to timely remit that sales tax reimbursement . . . to the board, shall be liable for a penalty of 40 percent of the amount not timely remitted"]; see *id.*, subd. (a)(2) [providing for certain exceptions].)

Reimbursement amounts are deducted from the sales price for the purpose of calculating gross receipts, but only if the retailer establishes that the tax was

added to the sales price and was not absorbed by the retailer. (§ 6012, subd. (c)(12) ["For purposes of the sales tax, if the retailers establish to the satisfaction of the board that the sales tax has been added to the total amount of the sale price and has not been absorbed by them, the total amount of the sale price shall be deemed to be the amount received exclusive of the tax imposed. Section 1656.1 of the Civil Code shall apply in determining whether or not the retailers have absorbed the sales tax"].)[8]

The corollary is that if the retailer "absorb[s]" the sales tax, the retailer owes the state tax on the full price. Sometimes the taxability of a sale depends on the identity of the purchaser, but it appears that nevertheless, for convenience, retailers in some instances may sell items at a single price to all buyers. For example, food bought from vending machines by students is exempt from tax (Cal. Code Regs., tit. 18, § 1574, subd. (b)(2)(D)), but the same purchase from the same machine by someone else on the school property is taxable. (*Id*., subd. (b)(2)(A).)

The amicus curiae brief filed by the Board posits that as far as the consumer is concerned, for economic purposes, the sales tax reimbursement charge is part of the price paid by the consumer. The Board suggests that "[a]ny retailer who tried to over-collect sales tax reimbursement from its customers would quickly find them going to another retailer whose prices were lower."

*4. Potential return to consumers of reimbursement charges*

As stated, plaintiffs' UCL and CLRA claims rest on the premise that Target violated the tax code by charging them a reimbursement amount on a retail sale

---

[8] It is the retailer's burden to rebut the presumption that sales tax was added to the sale price. (Cal. Code Regs., tit. 18, § 1667, subd. (a).) The presumption may be rebutted "by establishing to the satisfaction of the Board" that the sale was not subject to tax. (*Ibid*.)

25

that they allege was exempt from taxation. Before we analyze the current statutory provision governing excess reimbursement charges (§ 6901.5), we review the law that preceded it in order to understand the relative positions held in the statutory scheme by the consumer, the Board, and the taxpayer.

### a. Early law

Prior law imposed the sales tax on retailers but stated that the "tax hereby imposed shall be collected by the retailer from the consumer in so far as it can be done" (former § 6052, added by Stats. 1941, ch. 36, § 1, p. 536), and prohibited the retailer from advertising that it would absorb, omit, or refund the tax. (Former § 6053, added by Stats. 1941, ch. 36, § 1, p. 536.) As explained *post*, in part II.B.4.f., eventually, in 1978, these provisions were repealed because they were seen as potentially but inaccurately suggesting that it was the consumer who was the taxpayer, not the retailer.

### b. Former section 6054.5

In the meantime, in 1961 the Legislature added a provision that to some extent recognized consumer interests. Former section 6054.5 provided that if the retailer *knowingly* collected excess reimbursement, the amount should be refunded to the consumer or paid to the Board, and that the Board could condition a refund to the taxpayer on his or her payment of a refund to the consumer. It stated in pertinent part: "When an amount represented by a person to a customer as constituting reimbursement for taxes due under this part is computed upon an amount that is not taxable or is in excess of the taxable amount and is actually paid by the customer to the person, the amount so paid shall be returned by the person to the customer upon notification by the Board of Equalization or by the customer that such excess has been *ascertained*. In the event of his failure or refusal to do so, the amount so paid, if knowingly computed by the person upon an amount that is not taxable or is in excess of the taxable amount, shall constitute an obligation

26

due from him to this State.  Such obligation may be determined and collected by the board in accordance with Chapters 5 and 6 of this part.  The amount so collected shall be refunded by the board to the [taxpayer] . . . only upon submission of proof to the satisfaction of the board, or in the event the board denies his claim for refund, to the satisfaction of the superior court, that such amount has been returned or will be returned to the customer."  (Former § 6054.5, added by Stats. 1961, ch. 872, § 1, p. 2289, italics added.)

### *c.*  Decorative Carpets

We commented upon the customer's equitable interest in a refund of excess reimbursement amounts in *Decorative Carpets*, *Inc. v. State Board of Equalization* (1962) 58 Cal.2d 252 (*Decorative Carpets*), in which we also discussed former section 6054.5, enacted during the pendency of litigation in that case.  In *Decorative Carpets*, the taxpayer was a retail seller and also an installer of carpets. It mistakenly believed it was liable for tax on the total amount it charged the customer for the installed carpet.  In fact, as an installer it was merely liable for sales tax on the installed-carpet transaction based on the amount it had paid the wholesaler for the carpet.  "Because of its misunderstanding as to the proper method of computing the tax, plaintiff collected from its customers and paid to [the Board] $4,337.45 more than it should have collected and paid."  (*Id*. at p. 254.)

The taxpayer filed a claim for refund from the Board of the excess it had collected and paid, but it sought the refund for itself and did not intend to make any refund to its customers.  The Board responded that the taxpayer would be unjustly enriched if it could gain a refund of the excess it had paid without making a corresponding refund to customers to whom it had charged the full, excessive reimbursement amount.

We commented that even without reference to former section 6054.5, an *erroneously* computed and collected sales tax reimbursement amount is in some sense held in constructive trust, either by the retailer or, if the sum has been remitted to the state, by the state. (*Decorative Carpets*, *supra*, 58 Cal.2d at pp. 254-255.) We said that if the Board were treated as legally holding the excess tax payment in constructive trust for consumers, the ordinary result would be that the Board would be obliged to restore the amount in excess of the installer's correct tax liability to the taxpayer's customers. We explained, however, that such a direct remedy for consumers would be inappropriate, given the procedures established in the tax code. As we said: "[The Board's] liability to refund taxes erroneously collected, however, is governed by statute [citation] and *the orderly administration of the tax laws requires adherence to the statutory procedures* and precludes imposing on [the Board] the burden of making refunds to the taxpayer's customers." (*Id.* at p. 255, italics added.)

At the same time, we said, the Board bears some responsibility to consumers when excess sales tax has been remitted to it, given its "vital interest in the integrity of the sales tax." (*Decorative Carpets*, *supra*, 58 Cal.2d at p. 255.) Moreover, "[t]o allow plaintiff [taxpayer] a refund without requiring it to repay its customers the amounts erroneously collected from them would sanction a misuse of the sales tax by a retailer for his private gain." (*Ibid*.)

The *Decorative Carpets* case fell outside the new statutory provision regarding conditional refunds, not only because the enactment was adopted during the litigation but also because the claim involved a *mistaken*, not a *knowing* excess charge. We pointed out, however, that "the Legislature has never provided that customers are *not* entitled to recover from retailers amounts erroneously charged to cover sales taxes" (*Decorative Carpets*, *supra*, 58 Cal.2d at p. 256, italics added) and that it was, prior to enactment of the statute, and remained, subsequent

28

to its enactment, "left to the courts to adopt appropriate remedies when excessive reimbursements have been collected by mistake and paid to the state." (*Ibid*.) We concluded that it would be best to model our remedy on that provided specifically in former section 6054.5 — a refund to the taxpayer conditioned on proof satisfactory to the court that the taxpayer would refund the excess reimbursement to consumers. (*Decorative Carpets*, *supra*, at p. 255.)

In sum, our decision acknowledged that courts must recognize that "the orderly administration of the tax laws" requires that *consumer remedies be consonant with procedures set out in the tax code*. (*Decorative Carpets*, *supra*, 58 Cal.2d at p. 255.) At the same time, our decision found that consumers had some undefined equitable interest in a refund of excess reimbursement charges, and that the Board bore some responsibility to consumers when excessive sales tax amounts have been remitted to it, given its "vital interest in the integrity of the sales tax," and the risk that an unconditional refund to the taxpayer/retailer could permit unjust enrichment for the retailer. (*Ibid*.)

*d. 1968 amendment to former section 6054.5*

In 1968, the Legislature amended former section 6054.5 to remedy the omission we had identified in *Decorative Carpets* and to provide for situations in which the taxpayer *mistakenly*, as opposed to *knowingly*, charged excess reimbursement. The amended statute provided that if the retailer charged reimbursement that mistakenly exceeded his or her own proper tax liability on the sale, the retailer could refund the amount to the consumer, but if not, the full amount collected had to be remitted to the state, which in turn could condition refunds to taxpayers on proof that the amount that exceeded tax liability would be refunded to customers. Thus the first two sentences of the statute were retained but separated and designated as subdivision (a), and two new subdivisions were added: "(b) When transactions occur during any period for which a return is

29

required to be filed and the total of the amounts represented by a person to his customers as constituting reimbursement for taxes due under this part with respect to those transactions exceed the taxes due from the person measured by his gross receipts during that period, the excess, if paid by and not returned to the customers, shall constitute an obligation due from the person to this state.  The provisions of this subdivision shall apply when the amounts are mistakenly and not knowingly computed upon amounts that are not taxable or are in excess of the taxable amounts.  [¶]  (c)  The obligations specified in subdivisions (a) and (b) may be determined and collected by the board in accordance with Chapters 5 and 6 of this part.  The amount so collected shall be refunded by the board to the person in accordance with Chapter 7 of this part, only upon submission of proof to the satisfaction of the board, or in the event the board denies his claim for refund, to the satisfaction of the superior court, that such amount has been returned or will be returned to his customers."  (Former § 6054.5, as amended by Stats. 1968, ch. 501, § 1, pp. 1143-1144.)

> ### *e.*  Javor

The 1968 amendment of former section 6054.5 was followed by our decision in *Javor*, *supra*, 12 Cal.3d 790.  In that case, Congress had repealed a federal excise tax imposed on manufacturers for the sale of new vehicles and accessories.  The repeal was retroactive and federal law required manufacturers who obtained the benefit of the repeal to make refunds to purchasers.  Although purchasers received those refunds, they also had been charged excess state sales tax reimbursement amounts.  This was because the retailers who had sold them the vehicles had themselves paid state sales tax on a base price that included — now inappropriately — the federal excise tax, and had collected reimbursement from consumers in an amount that included that inappropriate amount.  The Board adopted a rule reducing the amount of the retailer's taxable gross receipts to reflect

30

the refund of the federal excise tax to consumers and providing that accordingly, the excess in "the sales tax will be refunded [by the Board] to the retailer provided [the retailer] also repays to the consumer the amount collected from [the consumer] as sales tax reimbursement." (*Javor*, *supra*, 12 Cal.3d at p. 794.)

Plaintiff, a purchaser of a new vehicle, sought to bring a class action against the Board and automobile retailers, alleging claims for money due and an accounting.[9] The plaintiff/consumer alleged that he had no remedy under the tax code. He pointed out that there was no statutory requirement that taxpayer/retailers seek a refund from the Board, nor was there a financial incentive for them to do so because the Board would simply require them to refund the excess to customers. He urged that a class should be certified to avoid requiring each member of the class to require each individual retailer to seek a refund from the Board. (*Javor, supra,* 12 Cal.3d at pp. 795, 797.) The plaintiff urged that under these unique circumstances, the court should fashion a remedy.

We turned to the general principle stated in *Decorative Carpets* that under ordinary constructive trust principles, the Board would hold mistakenly computed tax payments in constructive trust. (*Javor*, *supra*, 12 Cal.3d at p. 798.) As in our earlier decision we observed, however, that notwithstanding ordinary principles governing constructive trusts, the Board's liability is governed by the tax code and that " '*the orderly administration of the tax laws requires adherence to the statutory procedures* and precludes imposing on [the Board] the burden of making refunds to the taxpayer's customers.' " (*Id*. at p. 798, italics added.) Still, we

---

[9] The complaint named as defendants the Board, the State of California, a car dealership, and "all" California retailers of new vehicles. Our opinion noted, however, that "the Board is the only defendant either served with summons or appearing in the action." (*Javor*, *supra*, 12 Cal.3d at p. 793 & fn. 2.)

31

reiterated that " 'the Legislature has never provided that customers are *not* entitled to recover from retailers amounts erroneously charged to cover sales taxes.' " (*Id.* at p. 799, italics added.)

When we decided *Javor*, *supra*, 12 Cal.3d 790, the 1968 amendment to former section 6054.5 already authorized the Board to condition a refund for tax for which a *mistaken* reimbursement charge had been collected on proof that a refund had or would be made to consumers, but it did not prescribe a remedy when the retailer had paid the excess to the Board and *had not sought a refund*. (*Javor*, *supra*, at p. 800.) As there was no direct statutory provision for *consumer* refunds when taxpayers failed to seek a refund, we said that "we find ourselves in the same position as the court in *Decorative Carpets* and must fashion an appropriate remedy to effect the customers' right to their refund *which is consonant with existing statutory procedures*." (*Ibid*., italics added)

We agreed with the Board that it would not be consonant with the tax code or *Decorative Carpets* to fashion a remedy that would give consumers a cause of action against the Board for the excess amounts the retailer had paid in taxes. (*Javor*, *supra*, 12 Cal.3d at p. 800.) Nonetheless, we said, "in respect to the customer's right to be reimbursed by the retailer, the Board is not a neutral or disinterested party for two reasons: First it has a vital interest in the integrity of the sales tax and therefore a responsibility to customers who are entitled to a refund; and, second, it holds the excessive monies collected by the retailers who paid them to the Board and it is not entitled to them. Section 6054.5 and *Decorative Carpets* make it clear that both the Legislature and the courts have placed a duty upon the Board to see that the customer eventually obtains any refund [the Board] made to the retailer. Although . . . this duty may stop short of compelling the Board to repay the customers directly, nevertheless the Board cannot use the refund procedure to abdicate its responsibility to the customer,

32

particularly where the Board stands to unjustly profit under such circumstances." (*Javor*, *supra*, at p. 800.)

Of significance to the present case, we also recognized that under existing procedures, "the retailer is the only one who can obtain a refund from the Board," but observed that because the retailer cannot retain the excess tax amount for itself, but must undertake some procedure to make refunds to customers, it may have no particular interest in pursuing a tax refund. (*Javor*, *supra*, 12 Cal.3d at p. 801.) Similarly, the *Board* may lack incentive to examine returns on its own initiative to determine whether retailers have remitted excess taxes to it — that is, whether taxes have been *overpaid*. (*Ibid*.) We observed that the Board "is very likely to become enriched at the expense of the customer to whom the amount of the excessive tax actually belongs." (*Id*. at p. 802.)

We pointed out that the Board had issued instructions to retailers that they were entitled to refund of the excess sales tax provided they returned the refund to the customer. The Board's procedure initially required the retailer to pay the refund to the customer and *then* claim a refund from the Board, but the Legislature enacted special legislation so that for a period of approximately a year, retailers could avoid the refund process with the Board and simply claim a tax credit for the amount it had refunded to customers. Once that special provision expired, again the retailer was "the only one who can obtain a refund from the Board; yet, since the retailer cannot retain the refund himself, but must pay it over to his customer, the retailer has no particular incentive to request the refund on his own." (*Javor*, *supra*, 12 Cal.3d at p. 801.)[10]

---

**10**     We commented in passing that for the period during which the short-lived special statute had provided that retailers could simply claim a credit for the excess tax they had paid based on the federal excise provision, without the need

*(footnote continued on next page)*

33

We explained the remedy we adopted as follows: "[P]urchasers can most effectively enforce their refund right by compelling retailers to claim their own refunds from the Board. The Board has admitted that it must pay these refunds to retailers. All that plaintiffs seek in this action is to compel defendant retailers to make refund applications to the Board and in turn to require the Board to respond to these applications by paying into court all sums, if any, due defendant retailers. [¶] We think that to require this minimal action from the Board is clearly mandated by the Board's duty to protect the integrity of the sales tax by ensuring that the customers receive their refunds. The integrity of the sales tax requires not only that the retailers not be unjustly enriched [citation], but also that the state not be similarly unjustly enriched." (*Javor*, *supra*, 12 Cal.3d at p. 802.)

Our holding in *Javor* was limited to what we saw as "unique circumstances": "We hold that under the unique circumstances of this case a customer, who has erroneously paid an excessive sales tax reimbursement to his retailer who has in turn paid this money to the Board, may join the Board as a party to his suit for recovery against the retailer in order to require the Board in response to the refund application from the retailers to pay the refund owed the retailers into court or provide proof to the court that the retailer had already

---

*(footnote continued from previous page)*

for a refund action to establish their own right to refund, consumers could have sued the retailers who had claimed such a credit for refund. (*Javor*, *supra*, 12 Cal.3d at p. 802.) Our comment does not explain the legal basis of such an action, and former section 6054.5 no longer is in effect. Under current law, the taxpayer may remit the funds to the Board if he or she decides not to issue refunds to consumers. (§ 6901.5.) Moreover, in *Javor*, there was no controversy over the taxability question — it was agreed that an excess had been collected and the amount of the excess also was not in dispute.

34

claimed and received a refund from the Board. We think that allowing the Board to be joined as a party for these purposes in the customer's action against the retailer is an appropriate remedy entirely consonant with the statutory procedures providing for a customer's recovery of erroneously overpaid sales tax." (*Javor*, *supra*, 12 Cal.3d at p. 802, fn. omitted.)

### f. *Repeal of former section 6054.5*

In 1978, four years after we decided *Javor*, *supra*, 12 Cal.3d 790, former section 6054.5 was repealed. (Stats. 1978, ch. 1211, § 8, p. 3922.) The repeal occurred as part of a revision of the tax code that was intended to clarify that the incidence of the state sales tax is on retailers, not consumers. In the earlier tax system, some ambiguity had arisen about who was the real taxpayer for sales tax purposes. Even though we had affirmed that the tax fell upon the retailer, we acknowledged that some elements of the law could be interpreted to suggest otherwise. (*National Ice etc. Co. v. Pacific F. Ex. Co.* (1938) 11 Cal.2d 283, 286.) When a federal decision found that the California sales tax fell on a bank as a purchaser (see *Diamond National v. State Equalization* Bd. (1976) 425 U.S. 268), the revision was considered necessary. (Stats. 1978, ch. 1211, § 19, p. 3925; 9 Witkin, Summary of Cal. Law, *supra*, Taxation, § 344, p. 498.) The 1978 enactment clarified that the tax fell on the retailer "by *removing* from the code those provisions of law which have characteristics of laws which impose the *tax upon the consumer*." (Assem. Com. on Rev. & Tax., Analysis of Sen. Bill 472 (1977-1978 Reg. Sess.) as amended June 15, 1977, p. 3, italics added; see also 9 Witkin, *supra*, § 344, pp. 497-498; Selected 1978 California Legislation (1979) 10 Pacific L.J. 247, 585.) It repealed the former tax code provisions that had been seen as essentially *requiring* the retailer to collect reimbursement from customers and that plainly made it unlawful for the retailer to advertise that he or she would absorb the tax. (See former §§ 6052, 6053, repealed by Stats. 1978, ch. 1211, §§ 4

35

& 6, p. 3922, and see Historical and Statutory Notes, 59B West's Ann. Rev. & Tax. Code (1998 ed.) notes to former §§ 6052 to 6054.5, p. 468.) Of note for the present case, the enactment also repealed former section 6054.5, with its apparent concern for consumers. All of these repealed provisions evidently were thought to create a danger that they might support the view that consumers bore the economic burden of the tax and therefore were the actual taxpayers.

In their place, the Legislature added Civil Code section 1656.1, described above, permitting but not requiring the addition of reimbursement charges, designating the charges as a matter for a contractual agreement between seller and buyer, and permitting the retailer to absorb the tax. (Stats. 1978, ch. 1211, § 1, pp. 3915-3917; see Assem. Com. on Rev. & Tax., Analysis of Sen. Bill 472 (1977-1978 Reg. Sess.), *supra*, as amended June 15, 1977, pp. 1-3; Selected 1978 California Legislation, *supra*, 10 Pacific L.J. at pp. 585-588.)

As described by the Board in an administrative memo issued shortly after the repeal of former section 6054.5, with the repeal the law returned to its state prior to the enactment of former section 6054.5. The Board explained that with the repeal, it would "have no statutory duty to police the retail trade to ensure that only the correct amount of tax reimbursement is collected from the customers on retail sales. The repeal of section 6054.5 removes the authority for the Board to req[u]ire the retailer to either refund the excess reimbursement to the customer or pay it to the Board. [¶] However, in situations where the retailer has paid excess reimbursement to the Board and then seeks a refund, the legal staff believes the Board would be justified in refusing to refund the excess tax unless the retailer agrees to refund the tax to his customers. This is the *Decorative Carpets* . . . fact situation, which was decided on the law as it read prior to the addition of Section 6054.5." (State Bd. of Equalization, Operations Memo No. 611 (Oct. 23, 1978) p. 4 [on passage of Sen. Bill No. 472 (1977-1978 Reg. Sess.)].) The Board's

36

reliance on *Decorative Carpets*, *supra,* 58 Cal.2d 252, seems well founded, given our recognition in that case that even without former section 6054.5, consumers had some undefined equitable interest in refund of excess reimbursement and that, consistently with tax code provisions, the Board could condition taxpayer refunds on return of excess reimbursement payments to consumers.  (See *Decorative Carpets*, *supra*, at pp. 254-255.)

### g.  *Section 6901.5 — current law*

Four years later, in 1982, section 6901.5 was added to the tax code (Stats. 1982, ch. 708, § 2, p. 2867) and a minor revision in 1987 brought it to its current form.  (Stats. 1987, ch. 38, § 4, p. 101.)  The provision repeats the first and part of the second sentences of former section 6054.5, subdivision (a), language we had interpreted in *Decorative Carpets* as confirming that the Legislature viewed the consumer as having some equitable interest in a return of excess reimbursement charges but significantly, as we shall see, the provision also affords a safe harbor for retailers who remit the amounts to the Board.  Thus section 6901.5 provides: "When an amount represented by a person to a customer as constituting reimbursement for taxes due under this part is computed upon an amount that is not taxable or is in excess of the taxable amount and is actually paid by the customer to the person, the amount so paid shall be returned by the person to the customer upon notification by the Board of Equalization or by the customer that such excess has been *ascertained.  In the event of his or her failure or refusal to do so*, the amount so paid, if knowingly or mistakenly computed by the person upon an amount that is not taxable or is in excess of the taxable amount, shall be remitted by that person to this state.  Notwithstanding subdivision (b) of Section 6904 [concerning class claims], those amounts remitted to the state shall be credited by the board on any amounts due and payable under this part on the same transaction from the person by whom it was paid to this state and the balance, if

any, shall constitute an obligation due from the person to this state." (§ 6901.5, italics added.) In an uncodified section of the original enactment, the Legislature stated that the addition of section 6901.5 to the code was intended "to make a procedural change in the manner in which the sales tax is remitted and to affect all applicable pending proceedings." (Stats. 1982, ch. 708, § 4, p. 2868.)

The legislative history of the enactment is obscure. Section 6901.5 was appended to a bill on a different topic — the bill initially provided a sales tax exemption for sale of donated clothing. (See Assem. Bill No. 2619 (1981-1982 Reg. Sess.), as amended Feb. 11, 1982.) The Board opposed this exemption. (See Sen. Democratic Caucus, 3d reading analysis of Assem. Bill No. 2619, as amended Aug. 17, 1982, p. 2; see also Board's letter to Gov. Edmund G. Brown re Assem. Bill No. 2619 (1981-1982 Reg. Sess.) Sept. 7, 1982, pp. 3-4.) When the bill progressed to the Senate, section 6901.5 was added. (See Assem. Bill No. 2619 (1981-1982 Reg. Sess.) as amended Aug. 17, 1982.) The Senate amendment was described as "altering the manner in which sales tax amounts are remitted to the state." (Assem. Off. of Research, Concurrence in Sen. Amends. to Assem. Bill No. 2619 (1981-1982 Reg. Sess.) as amended Aug. 17, 1982, p. 1; see also Dept. of Finance, Enrolled Bill Rep. on Assem. Bill No. 2619 (1981-1982 Reg. Sess.) as amended Aug. 17, 1982, p. 2 [the bill "makes procedural changes in the manner in which the sales and use tax is remitted by providing that the retailer return to the customer any sales or use tax mistakenly collected. If the retailer fails to issue a refund to the customer, the [amount] must be remitted to the Board of Equalization. A credit will then be issued by the [Board] against the retailer's current obligation on the same transaction"].)

In its operations memo concerning the new provision, the Board expressed its view concerning the safe harbor afforded by the statute, asserting that by enacting section 6901.5, the Legislature intended "to allow a taxpayer to satisfy

38

his or her tax liability on a transaction by paying to the State an equivalent amount of tax reimbursement collected from a customer on the same transaction." (State Bd. of Equalization, Operations Memo No. 754 (Jan. 12, 1983), p. 1 [on passage of Assem. Bill No. 2619 (1981-1982 Reg. Sess.)] (Board Operations Memo No. 754).) In other words, "[t]ax reimbursement collected from a customer on a transaction is excessive only to the extent that it exceeds the taxpayer's own tax liability on the same transaction." (*Id.*, p. 2.)

In the same operations memo, the Board emphasized that "[i]f tax reimbursement in excess of the tax liability on a transaction is collected and paid to the State, the taxpayer has no further tax liability . . . ." (Bd. Operations Memo No. 754, *supra*, p. 1.) As for procedure, if the taxpayer pays the amount collected and seeks a refund, "any refund will be limited to the amount paid to the State in excess of the tax liability." (*Ibid.*) If the taxpayer does not remit the amount, the Board explained that "[i]f an audit discloses that tax reimbursement was collected in excess of the tax liability on the transaction, and that no tax has been paid to the State on the transaction, the tax liability will be assessed and the tax reimbursement in excess of that amount must be returned to the customer *or* paid to the State." (*Ibid.*, italics added.) The Board added that reimbursement amounts that exceed the taxpayer's liability "must be returned to the customer. If the taxpayer fails or refuses to return such excess tax reimbursement to the customer, it must be paid to the State whether it was mistakenly computed or knowingly computed." (*Id.*, p. 2.)

Section 6901.5 makes plain that the retailer is not permitted to *retain* excess sales tax reimbursement amounts. Indeed, the Board evidently saw this as a change. In connection with the possible retrospective operation of section 6901.5, the Board stated that during the period after section 6054.5 was repealed, "there was no requirement . . . that 'excess tax reimbursement' be paid to the state . . . ."

39

(Bd. Operations Memo No. 754, *supra*, p. 3.)  Under the terms of section 6901.5, however, the excess must be returned to consumers *or* remitted to the Board. Based upon the statutory language, it appears that a retailer may *refuse* a consumer's request that excess reimbursement be refunded, so long as the retailer remits the amount to the Board.  It follows that the taxpayer reaches a safe haven vis à vis the consumer if it pays the sums to the Board.

Section 6901.5 also refers to a return of excess reimbursement charges to consumers once it has been, in the words of the statute, "ascertained" that an excess has been charged.  Under the procedures established by the code, the Board could "ascertain" whether excess reimbursement was charged during an audit (see § 7054), a deficiency determination proceeding (see §§ 6481-6483), or Board consideration of a taxpayer's claim for refund.  (§ 6901 et seq.)  Section 6901.5 provides no procedure by which *consumers* can require the Board to "ascertain" whether excess reimbursement has in fact been charged, nor is there a statutory procedure by which the consumer can make certain that the retailer will be ordered to refund an excess amount to the consumer.

The Board's Business Taxes Law Guide repeats the Board's view that, under section 6901.5, once the retailer has remitted the tax in the amount of the excess tax reimbursement to the state, the retailer's obligations are at an end.  This guide also demonstrates that the Board contemplates that it is the retailer/taxpayer, not the consumer, who has standing to request any refund of amounts that have been remitted to the Board.  (2 State Bd. of Equalization, Business Taxes Law Guide, *supra*, Annot. No. 460.0028, at pp. 4762-4763; see *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7-8 (*Yamaha*) [a court analyzing a statute may take the Board's annotations into account, but they are not binding as quasi-legislative rules].)

40

Specifically, the annotation states that when it has been "determined" that a retailer collected excess reimbursement, retailers "must *either* refund the money to the customer(s) *or* remit it to the State. . . . [¶] In circumstances where the retailer has filed its returns for the applicable tax quarter and remitted the monies to the State, *it has complied with its duties under the Sales and Use Tax Law as to sales tax reimbursement*. Once the retailer has remitted the tax reimbursement to the Board, *the sole legal avenue available for determining the proper application of tax is for the retailer to submit a claim for refund under section 6901 . . .* [the general statute governing refunds]. . . . The Board may only grant a tax refund to the person who paid the tax. If the Board were to deny the claim for refund, the retailer could pursue an action in court for refund of sales tax under section 6933. *There is no provision in the law for an action on the part of a nontaxpayer to dispute the application of tax.*" (2 State Bd. of Equalization, Business Taxes Law Guide, *supra*, Annot. No. 460.0028, pp. 4762-4763, italics added.)[11]

h. "*Regulation 1700(b)(2)*" (Cal. Code Regs., tit. 18, § 1700, subd. (b)(2))

The regulation adopted to carry out the terms of section 6901.5, section 1700, subdivision (b)(2) of title 18 of the California Code of Regulations, amplifies the statute and offers some guidance on the situation in which excess

---

[11] The annotations also suggest that a retailer may avoid the need to make refunds to consumers if it advises consumers in advance that the price for the particular sale *includes* a reimbursement amount. In other words, the retailer charges the same price to the consumer, but by "absorbing" the tax itself within that price, the retailer excludes the consumer from the tax altogether even though the consumer pays the same price. This is achieved by posting a sign that "all prices include applicable sales tax." (2 State Bd. of Equalization, Business Taxes Law Guide, *supra*, Annot. No. 460.0149, at p. 4766.) According to an amicus curiae brief filed by the Board in this case, the Board informally advised Target to use this mechanism to avoid problems in the future.

41

sales tax reimbursement has been collected. The regulation makes it plain that the consumer's refund is dependent upon the Board first taking action to "ascertain[]" that the amount charged was excessive. The implication is that ordinarily it would be in the course of an audit, refund, or deficiency determination proceeding that the Board would "ascertain[]" that excess reimbursement amounts had been collected. In the case of an audit or deficiency determination, once the Board "ascertains" that an excess charge was made, the retailer is given the option to make a refund to the customer. If the retailer declines, the amount must be remitted to the state. The Board will make a determination against the retailer for any reimbursement amount that the retailer failed to remit to the state, adding applicable interest and penalties. Excess tax reimbursements are offset against the taxpayer's tax liability on the same transaction. The regulation provides in pertinent part as follows:

"(1) Definition. When an amount represented by a person [i.e., a retailer/taxpayer] to a customer as constituting reimbursement for sales tax is computed upon an amount that is not taxable or is in excess of the taxable amount and is actually paid by the customer to the person, the amount so paid is excess tax reimbursement. Excess tax reimbursement is charged when reimbursement is computed on a transaction which is not subject to tax, when reimbursement is computed on an amount in excess of the amount subject to tax, when reimbursement is computed using a tax rate higher than the rate imposed by law, and when mathematical or clerical errors result in an overstatement of the reimbursement on a billing.

"(2) Procedure upon Ascertainment of Excess Tax Reimbursement. Whenever *the board ascertains* that a person [i.e., a retailer/taxpayer] has collected excess tax reimbursement, the person will be afforded an opportunity to refund the excess collections to the customers from whom they were collected. In

42

the event of failure or refusal of the person to make such refunds, the board will make a *determination* against the person for the amount of the excess tax reimbursement collected and not previously paid to the state, plus applicable interest and penalty." (Cal. Code Regs., tit. 18, § 1700, subd. (b)(1) & (2), italics added.)

Various additional provisions govern offsets, which may be claimed by the taxpayer when he or she files a return, during deficiency determinations, or in refund proceedings. The regulation provides that "[i]f a person who has collected excess tax reimbursement on a transaction fails or refuses to refund it to the customer from whom it was collected, the excess tax reimbursement shall be offset against any tax liability of the taxpayer on the same transaction. Any excess tax reimbursement remaining after the offset must be refunded to the customer *or paid to the state*. The offset can be made when returns are filed, when a determination is issued, or when a refund is claimed." (Cal. Code Regs., tit. 18, § 1700, subd. (b)(4), italics added.)

The regulation states that the taxpayer's ability to offset tax liability on a transaction by excess reimbursement amounts does not necessarily limit the consumer's rights to a refund of the amount by which the reimbursement amounts collected exceeded the taxpayer's proper sales tax liability. Under the heading "Rights of Customers," the final paragraph of the regulation states: "The provisions of this regulation with respect to offsets do not necessarily limit the rights of customers to pursue refunds from persons who collected tax reimbursement from them in excess of the amount due." (Cal. Code Regs., tit. 18, § 1700, subd. (b)(6).)[12]

---

[12]    Retailers who choose to refund excess reimbursement rather than remit it to the Board must retain records to demonstrate they have or will return excess

*(footnote continued on next page)*

Contrary to plaintiffs' claim, this provision does not support the inference that the Board, without referring to consumer actions brought under the UCL or CLRA, by this language endorsed consumer actions against retailers for refund of reimbursement amounts charged on assertedly nontaxable sales. Rather, the regulation merely acknowledges that *if* other remedies are available, the regulation does not interfere with them. The regulation reasonably may be interpreted to refer to our recognition that, when neither the Board nor the taxpayer has an interest in "ascertaining" whether excess reimbursement has been charged, in limited circumstances consumers may file an action to require the taxpayer to seek a refund (see *Javor*, *supra*, 12 Cal.3d 790), leading to a refund to the taxpayer conditioned on an appropriate refund to consumers. (See *Decorative Carpets*, *supra*, 58 Cal.2d 252.)

The provision also means that the regulation does not bar other, more informal efforts on the part of consumers. In its amicus curiae brief in this court,

---

*(footnote continued from previous page)*

amounts to consumers. The regulation provides: "(A) If a person already has refunded to each customer amounts collected as reimbursement for tax in excess of the tax due, this may be evidenced by any type of record which can be verified *by audit* such as: [¶] 1. Receipts or cancelled checks. [¶] 2. Books of account showing that credit has been allowed the customer as an offset against an existing indebtedness owed by the customer to the person. [¶] (B) If a person has not already made sales tax reimbursement refunds to each customer but desires to do so *rather than incur an obligation to the state*, the person must: [¶] 1. Inform in writing each customer from whom an excess amount was collected that the excess amount collected will be refunded to the customer or that, at the customer's option, the customer will be credited with such amount, and [¶] 2. The person must obtain and retain for verification by the board an acknowledgement from the customer that the customer has received notice of the amount of indebtedness of the person to the customer." (Cal. Code Regs., tit. 18, § 1700, subd. (b)(3), italics added.)

44

the Board asserts that although no formal administrative procedure is available by which consumers may require the Board to "ascertain[]" whether excess reimbursement has been charged, consumers may complain informally to the Board if they believe they have been charged excess tax reimbursement. The Board's amicus curiae brief notes that the agency's customer service representatives filed a large volume of calls and emails from the public. (See Bd. of Equalization, 2009-2010 Annual Report, p. 24 <http://www.boe.ca.gov/annual/pdf/2010/4-needs10.pdf> [as of May 1, 2014].) The brief also asserts that tips from informants may lead the Board to conduct an audit (see Bd. of Equalization, Dept. of Sales and Use Tax, Audit Manual, § 0122.02 < http://www.boe.ca.gov/sutax/manuals/am-01.pdf>[as of May 1, 2014]) and that informal complaints could lead to a deficiency determination against the taxpayer. The Board also comments that consumers as "interested person[s]" may petition the Board to adopt, amend, or repeal a regulation (Gov. Code, § 11340.6), and that they may file a declaratory relief action that does not seek an adjudication of tax liability but merely challenges a regulation as inconsistent with statute or constitution. (*Id*., § 11350.) Nothing in the regulation would interfere with any of these remedies.

*5. Summary*

The above review of the sales tax scheme depicts a system that comprehensively regulates taxation on myriad types of transactions, and confirms that the Board is the entity responsible for determining in the first instance whether transactions, in their nearly infinite variety, are taxable and how much tax is due. This review has also demonstrated that it is the Board that "ascertains" whether a retailer has charged excess reimbursement on a sale and that a retailer may either refund excesses to consumers or remit them to the Board. It is the Board that is the entity charged with assuring the "integrity of the sales tax"

45

following statutory procedures assuring the "orderly administration of the tax laws." (*Decorative Carpets*, *supra*, 58 Cal.2d at p. 255; see *Javor*, *supra*, 12 Cal.3d at pp. 798, 800.)

For reasons we shall explain in the next part, we conclude that permitting plaintiffs to use the UCL or CLRA to challenge Target's collection of a sales tax reimbursement on the ground that the sale was not taxable is inconsistent with the tax code provisions relating to the sales tax, particularly in light of the primary role assigned to the Board with regard to the resolution of sales tax issues and the presumption that all sales are taxable unless the taxpayer demonstrates otherwise to the satisfaction of the Board. When a consumer claim such as plaintiffs' is dependent upon the resolution of the taxability question, a UCL or CLRA lawsuit of this sort against the retailer is inconsistent with the method established by the Legislature as the exclusive means for ascertaining whether a transaction is subject to the sales tax. A consumer lawsuit in this context also is inconsistent with tax code procedures under which retailers may discharge their obligations by remitting any excess reimbursement charge to the Board.

## C. Are plaintiffs' consumer claims inconsistent with the statutory sales tax system?

Plaintiffs, joined by the Attorney General as amicus curiae, urge that the UCL affords consumers a broad form of action, that the remedies provided by the UCL are cumulative to other remedies "[u]nless otherwise expressly provided by law" (Bus. & Prof. Code, § 17205), and that UCL actions are recognized for conduct that violates a statute that itself provides for no private right of action. (See *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 562 (*Stop Youth Addiction*).) They contend that the tax code does not specifically bar actions other than those recognized in that code. (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180, 183 (*Cel-*

46

*Tech*) ["To forestall an action under the unfair competition law, another provision must actually 'bar' the action"]; see also *State of California v. Altus Finance* (2005) 36 Cal.4th 1284, 1303 & fn. 6 (*Altus Finance*) ["the fact that there are alternative remedies under a specific statute does not preclude a UCL remedy, unless the statute itself provides that the remedy is to be exclusive"; leaving open whether an implied repeal of UCL remedies occurs when the UCL and another statutory remedy are clearly repugnant and so inconsistent that both cannot apply]; *Stop Youth Addiction*, *supra*, at p. 573.)

Plaintiffs also contend that because the tax code affords them no formal procedure by which to seek a refund of a reimbursement charge on a nontaxable sale, it is reasonable to conclude that their remedy lies elsewhere — with the UCL and CLRA. The Attorney General joins plaintiffs in urging the broad protections of the UCL and CLRA should be available to consumers who are charged for sales tax reimbursement on a nontaxable sale, emphasizing the absence of other measures requiring the Board or retailers to protect consumers, and claiming that the tax code and remedies under the consumer laws are not in direct conflict.

We have explained that "[t]he UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business act or practice.' ([Civ. Code,] § 17200.) Its purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.' [Citations.] In service of that purpose, the Legislature framed the UCL's substantive provisions in ' "broad, sweeping language . . . ." ' " (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320 (*Kwikset*).) This may " 'include " 'anything that can properly be called a business practice and that at the same time is forbidden by law.' " ' " (*Ibid*.) In addition, a practice that is unfair or fraudulent may be the basis for a UCL action even if the conduct is "not

47

specifically proscribed by some other law." (*Cel-Tech*, *supra*, 20 Cal.4th at p. 180; see *id.*, at p. 184.)

The UCL was intended " 'to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur' " and to " 'enable judicial tribunals to deal with the innumerable " 'new schemes which the fertility of man's invention would contrive.' " [Citation].' " (*Cel-Tech*, *supra*, 20 Cal.4th at p. 181.)

As for the CLRA, it "makes unlawful . . . various 'unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer.' These include . . . '[r]epresenting that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law' . . . ." (*Meyer v. Sprint Spectrum L.P.* (2009) 45 Cal.4th 634, 639 (*Meyer*); see Civ. Code, § 1770.) Like the UCL, CLRA remedies are not exclusive, but are "in addition to any other procedures or remedies for any violation or conduct provided for in any other law." (Civ. Code, § 1752.)

On the other hand, the reach of the UCL is broad, but it is not without limit and may not be used to invade "safe harbors" provided by other statutes. (*Cel-Tech*, *supra*, 20 Cal.4th at p. 182.) "Courts may not simply impose their own notions . . . as to what is fair or unfair. Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a '*safe harbor*,' plaintiffs may not use the general unfair competition law to assault that harbor." (*Ibid.,* italics added.) When a statute such as that defining the litigation privilege, for example, renders the conduct complained of immune from

tort liability, a plaintiff cannot use the UCL to " ' "plead around" ' " that immunity. (*Ibid.*) "To forestall an action under the unfair competition law, another provision must actually 'bar' the action or *clearly permit* the conduct." (*Id.* at p. 183, italics added.) As we further explained: "If, in the Unfair Practices Act (or some other provision), the Legislature considered certain activity in certain circumstances and determined it to be lawful, courts may not override that determination under the guise of the unfair competition law." (*Ibid.*)

These comments on statutory safe harbors are directly relevant in the present case. In express conflict with plaintiffs' contention that defendant acted "unlawfully" within the meaning of the UCL when it represented that it properly was collecting and in fact collected reimbursement on assertedly nontaxable sales and failed to return the reimbursement charges to consumers, under the tax code retailers have an *option* either to refund to consumers any reimbursement charges the Board has ascertained are excessive *or* to remit the excess amounts to the Board. (§ 6901.5.) Retailers reach a safe harbor once they remit any excess reimbursement amount to the state — and of course follow any ensuing orders by the Board with respect to consumer refunds. Yet plaintiffs contend that their consumer action should lie whether or not the retailer has remitted the disputed amounts to the Board. Plaintiffs' UCL claim is premised on a hypothetical system under which the retailer/taxpayer must refund excess amounts *directly* to consumers — without any effort on the part of the Board to "ascertain[]" whether there was indeed excess reimbursement collected. This is not the system currently established by the tax code. The UCL cannot properly be interpreted to impose on retailers a duty with respect to sales tax that is contradicted by the statutory scheme governing the sales tax. (See, e.g., *In re Tobacco Cases II* (2007) 41 Cal.4th 1257, 1273 [the plaintiffs' UCL claim sought to impose on tobacco

49

companies a duty not to advertise in a way that could encourage minors to smoke, but such a duty is preempted by federal authority].)

Moreover, in some instances, an action may not lie under the UCL because another statutory scheme provides the exclusive means for resolving disputes. For example, a claim cannot be brought under the UCL if it falls within the scope of the exclusive remedy provision of the workers' compensation law and the "risks encompassed by the compensation bargain" — even if the claim is " 'collateral to or derivative of' an injury compensable by the exclusive remedies of the [workers' compensation system]." (*Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 811-812 (*Vacanti*).) We explained in *Vacanti* that "[w]here the acts are a ' "normal" part of the employment relationship' [citation], or worker's compensation claims process [citation], or where the motive behind these acts does not violate a 'fundamental policy of this state' [citation], then the cause of action is barred." (*Id.*, at p. 812; see *id.* at pp. 812-813 [the holding encompassed plaintiffs who were medical providers, not employees, but whose claim that insurers mishandled lien claims was " 'collateral to or derivative of' " an injury falling within the workers compensation scheme]; see also *Altus Finance*, *supra*, 36 Cal.4th at p. 1291 [the Attorney General may not bring a UCL action for restitution that "trespasses directly on the core function of the [Insurance] Commissioner"]; *id.* at pp. 1304-1305 [Insurance Commissioner has exclusive authority under the relevant statute to exercise power as trustee to protect policyholders and creditors when an insurance company is insolvent; irrelevant that UCL plaintiff was Attorney General rather than policy holder]; *MacKay v. Superior Court* (2010) 188 Cal.App.4th 1427, 1434, 1441-1443 [a UCL action will not lie to challenge an insurance rate previously approved by the Dept. of Insurance].)

We may draw an analogy between the present case and the workers' compensation scheme discussed in *Vacanti*. Whether alleged under the UCL or the CLRA, plaintiffs' claim is that defendant injured them by representing that it was charging — and actually charging — reimbursement amounts on what plaintiffs assert are nontaxable sales. The claim depends upon the correctness of the allegation that, as a matter of law, and notwithstanding the presumption that sales are taxable unless the taxpayer demonstrated otherwise, defendant did not owe the state the tax because the defendant's sales of hot coffee to go at its various premises were exempt from the sales tax. Before any court could enjoin Target from collecting reimbursement charges on such nontaxable sales in the future, or order defendant to refund such improperly charged reimbursement amounts to plaintiffs, the court hearing plaintiffs' claims would have to decide whether the sales were taxable or exempt. But the tax code contemplates that the method by which the *taxability of a sale* may be challenged and determined is through an audit or deficiency determination made by the Board, or through a taxpayer's refund claim before the Board, followed by judicial review of the Board's decision.

The taxability question lies at the center of the Board's function and authority. We have seen that the sales tax law is exceedingly comprehensive and complex; its application to specific types of transactions is debatable in innumerable circumstances. The Legislature has subjected such questions to an administrative exhaustion requirement precisely to obtain the benefit of the Board's expertise, permit it to correct mistakes, and save judicial resources. (See *Preston*, *supra*, 25 Cal.4th at p. 206; see also *Yamaha*, *supra*, 19 Cal.4th at p. 7; *Plaza Hollister Ltd. Partnership v. Co. of San Benito* (1999) 72 Cal.App.4th 1, 23.) Permitting plaintiffs to maintain their UCL and CLRA actions against Target based on a dispute over the taxability of a sale would require resolution of the

taxability question in a manner inconsistent with this system, forfeiting these benefits.

As for the applicable procedures by which tax matters are resolved, it would be anomalous if persons not subject to the tax were in a better position than taxpayers to secure judicial review of the question whether a certain transaction is subject to the sales tax or is exempt. (See *Chiatello v. City and County of San Francisco* (2010) 189 Cal.App.4th 472, 476, 496-497 [making a similar point in denying standing to a local taxpayer to challenge amendment to a payroll tax to which he was not subject].) Taxpayers themselves cannot circumvent the administrative procedures the tax code provides for ascertaining the application of the tax to their transactions. (§ 6932; see also § 6931.) They cannot obtain a declaratory judgment on such questions in advance of paying the tax, nor can they go to court for declaratory relief concerning the application of the law to their transactions without first exhausting administrative remedies by making a claim for refund. (§§ 6931, 6932; *Woosley*, *supra*, 3 Cal.4th at p. 785, fn. 20; *State Bd. of Equalization v. Superior Court*, *supra*, 39 Cal.3d at pp. 639-640; *Pacific Gas & Electric Co.*, *supra*, 27 Cal.3d at p. 280; *Modern Barber Col. v. Cal. Emp. Stab. Com.* (1948) 31 Cal.2d 720, 726 ["The power of a state to provide the remedy of suit to recover alleged overpayments as the exclusive means of judicial review of tax proceedings has long been unquestioned"]; 9 Witkin, Summary of Cal. Law, *supra*, Taxation, § 375, pp. 548-549; but see *Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 320 [under certain circumstances not involving a claim for refund, a taxpayer may challenge the facial statutory or constitutional validity of a settled Board policy or a regulation by means of a declaratory relief action under Gov. Code, § 11350].)

The tax code does not permit consumers to *require* the Board to ascertain whether excess reimbursement charges have been made. Rather, with respect to

excess reimbursement charges, section 6901.5 contemplates that it is for the Board to ascertain under its normal procedures whether any mistake has been made. If the matter is not raised through an audit or a deficiency determination, it is for the taxpayer to claim a refund from the Board, which may in turn require the taxpayer to refund excess reimbursement to consumers. Again, section 6901.5 confirms that binding decisions on such disputes are committed to the Board in the first instance, with the *taxpayer* as the party with standing to make a claim for a refund. As we have seen, under the Board's annotations, the consumer lacks standing in disputes over the application of the tax law to particular transactions. (2 State Bd. of Equalization, Business Taxes Law Guide, *supra*, Annot. No. 460.0028, pp. 4762-4763 ["In circumstances where the retailer has filed its returns for the applicable tax quarter and remitted the monies to the State, it has complied with its duties under the Sales and Use Tax Law as to sales tax reimbursement. Once the retailer has remitted the tax reimbursement to the Board, *the sole legal avenue available for determining the proper application of tax is for the retailer to submit a claim for refund under section 6901 . . . et seq.* The Board may only grant a tax refund to the person who paid the tax. If the Board were to deny the claim for refund, the retailer could pursue an action in court for refund of sales tax under section 6933. *There is no provision in the law for an action on the part of a nontaxpayer to dispute the application of tax*"].) (Italics added.)

Plaintiffs' claim also depends on a view of the retailer's *duties* to consumers that may be inconsistent with the approach taken in the tax code. When the question whether a transaction is taxable or exempt arises between the *retailer* and the taxing entity under procedures established by the tax code, it is *presumed* that the transaction is taxable unless the taxpayer establishes to the contrary. (§ 6091; *Lyon Metal Products, Inc. v. State Bd. of Equalization* (1997) 586 Cal.App.4th 906, 912.) The retailer, as taxpayer, bears the burden of

maintaining records and demonstrating that the transaction is exempt from the sales tax. (*Southern California Edison*, *supra,* 7 Cal.3d at p. 663; *Modern Paint & Body Supply, Inc. v. State Bd. of Equalization* (2001) 87 Cal.App.4th 703, 707-708; *Paine*, *supra*, 137 Cal.App.3d at p. 443; see also *Schwartz*, *supra*, 31 Cal.2d at p. 64.) Given the taxpayer's burden of proof, the fact that retail sales are presumed to be subject to the sales tax, and the fact that a retailer is not required to seek a refund but rather will be deemed to have waived the right to refund if a timely claim is not filed (§ 6905), it would not be unreasonable if the retailer's tax payment to some extent erred on the side of considering sales taxable. Indeed, the taxpayer may recognize that it has failed to retain records adequate to carry its burden of establishing it is entitled to an exemption or has overpaid.

The Board also suggests that in its view, taxpayers are not required to take advantage of sales tax exemptions, and owe no duty to consumers in that respect. The Board argues that the injunction plaintiffs seek would require a holding that defendant was not entitled to waive the benefit of the alleged exemption — despite section 6933, which provides that a taxpayer's failure to bring a claim within the statutory period constitutes a waiver "of any demand against the state on account of alleged overpayments." (§ 6933.)

Other conflicts between the tax code and the consumer remedies claimed by plaintiffs are readily identified. Under the tax code, if the taxability question proceeds from administrative proceedings to court, the Board will be the opposing party in any ensuing legal challenge. (See § 6933; see also § 6711.) The Board will be present to fully and vigorously litigate its position, leading to a judgment that defines the law for all and is binding on the Board for the future. Plaintiffs, by contrast, seek a proceeding that would produce a binding interpretation of tax law, but in which a party considered by the Legislature to be necessary, namely the Board, would be absent. In addition, to permit plaintiffs' action to determine

54

the taxability question in advance or separate from any claim by the taxpayer could produce inconsistent judgments on that point. A judgment in a quickly litigated consumer action could occur in advance of the Board's resolution of the same question, or in advance of a judgment reviewing the Board's determination.

Furthermore, in the context of a refund claim filed by a taxpayer, the Board would be able to determine whether the state should refund excess tax to the taxpayer (conditioned on refund to customers) in order to avoid unjust enrichment of the *state*. In a consumer action such as plaintiffs', by contrast, the action would be directed solely at the taxpayer and would not seek to require the Board to refund any excess amount that had been remitted to it. The Board would thereby lose the ability to ensure the integrity of its own tax collections.

We also note that the tax code imposes various time limits for Board and taxpayer claims that differ from limitations periods for consumer claims. For example, taxpayers generally must seek a refund within three years after the end of the reporting period in which the alleged overpayment was made or six months after the date of a deficiency determination. (§ 6902; Cal. Code Regs., tit. 18, § 5231; see also § 6487 [ordinarily the Board's notice of deficiency determination must be mailed within three years of the filing of the return].) A UCL action, by contrast, may be brought within four years after the cause of action accrued (see Bus. & Prof. Code, § 17208; *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 178-179 [UCL limitations period applies even to claims based on violation of statutes bearing shorter limitations periods].)

It is evident how exceedingly numerous, as well as arcane, would be the disputes advancing to court for judicial resolution if consumer reimbursement claims turning on the taxability question could be brought under the UCL and CLRA. As a practical matter, if we did not view the tax code as providing the exclusive procedure under which a claim such as plaintiffs' may be resolved,

independent consumer claims against retailers for restitution of reimbursement charges on nontaxable sales could form a huge volume of litigation over all the fine points of tax law as applied to millions of daily commercial transactions in this state. Such litigation would occur outside the system set up by the Legislature to develop that law, and without the benefit of the Board's expertise or its ability to conserve judicial resources by correcting error by means of administrative proceedings. Actions of this sort could displace the Board and the procedures currently established by the Legislature, thereby undermining the "orderly administration of the tax laws." (*Decorative Carpets, supra,* 58 Cal.2d at p. 255.)

We also observe that permitting plaintiffs' action to go forward as currently framed would raise the constitutional questions identified by the Court of Appeal. A UCL or CLRA action requiring a court to determine the taxability of a sale would produce practical consequences that could threaten revenue collection and the ability of government to plan for expenditures. In an administrative claim or lawsuit brought under tax code procedures, the retailer/taxpayer necessarily will already have paid the tax — including an amount reflecting any reimbursement charges the retailer has declined to return to consumers. In a consumer action, by contrast, a judgment on the question of taxability could be entered in a consumer suit without any requirement that the tax have been paid — a result that would at least strain the constitutional principle that taxes should be paid first and litigated second in order to ensure that the state is able to plan its budget. Plaintiffs' claim that they should not be required to allege whether or not the Board has received the disputed tax payments from the retailer because such facts are not available to them simply highlights the threat to the integrity of the tax system that an independent consumer lawsuit such as theirs presents.

Further impact on revenue collection would follow an injunction prohibiting retailers from collecting the reimbursement, because the injunction

56

necessarily would be based upon a determination whether certain sales were taxable or exempt. This would affect the retailer's (and its accountant's) view of the legal question of what sales the retailer should in the *future* include in its estimate of its gross taxable income. So in the end, as the Court of Appeal recognized, such an injunction could indirectly reduce the flow of tax revenue in the future.[13] It is a troubling prospect that this effect could occur totally outside the regulatory system established in the tax code, without any litigation between the state and the taxpayer concerning the latter's duties. Again, these consequences present at least a potential for the conflict with article XIII, section 32 that was envisioned by the Court of Appeal, and of course statutes should be interpreted to avoid potential constitutional concerns.

The prospect of a question of tax law being settled without any litigation between the state and the taxpayer implicates another element of the constitutional provision — that is, the obligation that courts defer to the system established by the Legislature for ascertaining tax liability and a taxpayer's entitlement to a refund. If a retailer decided to continue to pay the tax, collect the reimbursement the consumer considers excessive, and seek a refund according to normal tax code procedures, the Board in that proceeding could be faced with a final judgment — arising from prior consumer litigation in which it was not involved — purporting to determine the taxability question. In this sense, an action for a tax refund would be brought, or at least would be processed, not entirely "*in the*

---

[13]     The sales and use tax produced 20 percent of state tax revenues in the 2012-2013 fiscal year. (Cal. State Controller's Office, State Finances 101 <http://www.sco.ca.gov/state_finances_101_state_taxes.html> [as of May 1, 2014].)

*manner* prescribed by the Legislature." (*Woosley*, *supra*, 3 Cal.4th at p. 789, italics added.)

In sum, the existing sales tax system is irreconcilable with these plaintiffs' UCL and CLRA claims.

Plaintiffs' claim that consumer actions such as theirs are necessary to deter misconduct by the retailer is unfounded, as is their claim that our decisions in *Decorative Carpets*, *supra*, 58 Cal.2d 252, and *Javor*, *supra*, 12 Cal.3d 790, support their argument in favor of a consumer action. First, the Legislature has provided the methods it believes necessary to deter and punish taxpayer misconduct by enacting statutes authorizing the exaction of interest and the imposition of financial, criminal, and other penalties against taxpayers who fail to remit sales tax to the state. (See § 6597 [any retailer who knowingly collects sales tax reimbursement but fails to timely remit the amount to the Board is subject to a penalty of 40 percent of the amount not timely remitted]; see also §§ 6484- 6485 [general penalties], 6512 [interest on tax deficiencies], 6514 [penalty for fraud], 6591 [interest and penalty for late payments or nonpayments].)

Concerns about providing a remedy so that the retailer is not unjustly enriched thus have been mitigated since our decisions in *Decorative Carpets*, *supra*, 58 Cal.2d 252, and *Javor*, *supra*, 12 Cal.3d 790. The Legislature has taken steps that diminish the need to consider a consumer remedy that is independent of the tax code. Section 6597, subdivision (a)(1), with its 40 percent penalty, was adopted in 2006. (Stats. 2006, ch. 252, § 1, p. 2167; see Sen. Com. on Rev. & Tax., Analysis of Sen. Bill No. 1449 (2005-2006 Reg. Sess.) for hearing on Apr. 26, pp. 1, 2 [previously, no specific penalty applied to failure to remit the tax after knowing collection of sales tax reimbursement]; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Sen. Bill No. 1449 (2005-2006 Reg. Sess.) as amended Aug. 7, 2006, p. 2 [it was difficult for the Board to demonstrate the

58

mental element required under § 6484 to impose the general 25 percent penalty for fraud or intent to evade tax; the enactment " 'will enable [the Board] to impose a stiff, swift, and sure penalty on dishonest retailers who collect sales tax reimbursement from consumers, but who keep the money for themselves rather than remitting it to the state' "].)

We note, too, that criminal penalties have been increased since *Javor* and *Decorative Carpets* were decided. Although tax code violations that are subject to criminal penalty ordinarily are misdemeanors (see §§ 7152-7153), in 1987 the Legislature designated as a felony those tax code violations in which the taxpayer intentionally evades the tax when the omitted payments amount to $25,000 or more a year. (§ 7153.5; see also former § 7153.5, added by Stats. 1987, ch. 1064, § 1, p. 3599.)

In addition, we have seen that, with the adoption of section 6901.5 in 1982, the Legislature made it plainer that the retailer may not retain *any* amount it has represented to the consumer as sales tax reimbursement. Rather than simply saying, as under former section 6054.5, that the amount collected in error "shall constitute an obligation due from him [the retailer] to this State" and that "[s]uch obligation may be determined and collected by the Board" (former section 6054.5; Stats. 1961, ch. 872, § 1, p. 2289), section 6901.5 currently directly states that any amount collected on a nontaxable sale or in excess of the proper amount that is not returned to consumers "shall be remitted by that person [the taxpayer] to this state." Because reimbursement charges that are not returned to customers now must flow to the Board in the form of tax payments, it is clear that a remedy that is directed at requiring the taxpayer to make a claim for refund from the Board, rather than one involving a direct claim by the consumer against the retailer, is the remedy that is consistent with the current governing statutory scheme.

59

Neither *Javor*, *supra*, 12 Cal.3d 790, nor *Decorative Carpets*, *supra*, 58 Cal.2d 252, contains language implying that current law — with its firmer identification of the retailer as the taxpayer, its safe harbor for retailers who have paid the state amounts they collected as reimbursement, and its penalty system — would require that a court approve a consumer action that would in various ways be inconsistent with the tax code. Rather, in those cases we warned that any remedy must be constrained by and not *inconsistent* with the tax code. We carefully identified an appropriate means to vindicate a consumer interest in a refund of a reimbursement charge *without* embracing procedures that were inconsistent with the tax code or disregarded the central function of the Board. In addition, the taxability question was not in dispute in those cases. The decisions certainly do not suggest that a question concerning the applicability of the tax code to a particular type of transaction should be resolved in a consumer action.

The integrity of the tax system and avoidance of unjust enrichment, possibly of the retailer, but more probably of the state, in certain circumstances may support a *Javor*-type remedy for consumers. Plaintiffs, however, declined to pursue such a remedy, and we need not consider the exact showing required of consumers to demonstrate their entitlement to the *Javor* remedy.

Plaintiffs argue that in a number of past cases courts have "considered the merits of [consumer] actions against private companies for wrongful sales tax reimbursement." None of the decisions they cite, however, discuss the appropriateness of the UCL as a vehicle for a consumer to raise such a claim against a retailer/taxpayer. In *Dell, Inc. v. Superior Court* (2008) 159 Cal.App.4th 911, for example, although the court decided a taxability question — whether service contracts included in the sale of a computer were subject to sales or use tax or were exempt — in the context of a UCL action brought by consumers against the seller of consumer goods, there was no dispute regarding, or discussion by the

60

appellate court concerning, the appropriateness of the UCL as a vehicle to raise such an issue. The same omission deprives the other decisions cited by plaintiffs of any weight in the present case. (*Botney v. Sperry & Hutchinson Co.* (1976) 55 Cal.App.3d 49 [in suit by class of consumers who had redeemed S & H Green stamps against the stamp issuer, issue was whether sales tax based on an average amount paid by retailers for the stamps was appropriate];[14] *Livingston Rock & Gravel Co. v. De Salvo, supra,* 136 Cal.App.2d 156 [a lease agreement did not require the lessee to indemnify the owner for sales tax the owner had paid to the Board].) It is well established, of course, that " 'cases are not authority for propositions not considered.' " (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388.)

The sales tax scheme contemplates that the question of the propriety of a reimbursement charge that turns on the taxability of a transaction must be resolved in the first instance by the Board in the context of a procedure recognized in the tax code and applying the safe harbor measures contained in that code. Accordingly, plaintiffs' consumer action based on the assertion that defendant collected reimbursement on a nontaxable sale may not be maintained.[15]

---

[14] Plaintiffs' "see also" citation to *Sav-On Drugs, Inc. v. Superior Court* (1975) 15 Cal.3d 1 is unhelpful, because the action before us in that case was a petition for peremptory writ challenging a trial court's discovery order. We decided that the petitioner's tax returns were privileged, but we had no occasion to consider the appropriateness of the underlying consumer action challenging a Board regulation concerning sales involving trading stamps, and contending that defendant seller had charged excessive "sales tax" to its customers in connection with such sales.

[15] We express no view on a question not presented by the complaint in this case, namely whether consumers may bring a UCL or CLRA claim against retailers for representing that they will remit, but in fact failing to remit amounts represented as reimbursement charges to the Board. As noted, in their

*(footnote continued on next page)*

61

## III.  CONCLUSION

For the reasons discussed above, the judgment of the Court of Appeal is affirmed.

CANTIL-SAKAUYE, C. J.

WE CONCUR:

BAXTER, J.
CORRIGAN, J.
CHIN, J.

---

*(footnote continued from previous page)*

supplemental briefing plaintiffs have acknowledged that their current action is not based on such a claim.

**DISSENTING OPINION BY LIU, J.**


Whether Target may charge sales tax on a cup of coffee is probably not the most gripping issue before the California Supreme Court this term. But this is not really a tax case. This is a case about the reach of consumer protection statutes that prohibit unfair business practices, including misrepresentations by a retailer as to what its customers are actually paying for. Today's decision weakens those statutes by blessing an arrangement that mutually benefits retailers and the state treasury at the expense of everyday consumers. Because our tax laws do not foreclose private enforcement of consumer rights in the manner the court suggests (if they do at all), I respectfully dissent.

**I.**

When we go to a store like Target, we pay sales tax on many of the things we buy. Legally speaking, though, what we commonly call sales tax is actually sales tax *reimbursement* because the tax applies to the retailer, not the customer. (Rev. & Tax. Code, § 6051; all undesignated statutory references are to this code.) In other words, the retailer is the taxpayer responsible for paying sales tax; when a customer pays sales tax on a transaction, the customer is actually reimbursing the retailer for its sales tax liability arising from the transaction. Importantly, no law requires a retailer to recoup sales taxes from its customers, and no law requires customers to reimburse a retailer for sales taxes. "Whether a retailer may add sales tax reimbursement to the sales price of the tangible personal property sold at

1

retail to a purchaser depends solely upon the terms of the agreement of sale."
(Civ. Code, § 1656.1, subd. (a).)  As with any sales agreement, the terms must not misrepresent what the purchaser is paying for.

According to plaintiffs' allegations, which we accept as true on demurrer, Target charges its customers sales tax reimbursement on all sales of hot coffee to go even though not all such sales are subject to sales tax.  As the complaint says, Target "falsely and illegally represented to members of the general public that it had the legal right to charge the sales taxes," thereby causing customers to pay an additional charge on hot coffee to go based on a misrepresentation.  This misrepresentation, plaintiffs contend, violates the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.) and the Consumer Legal Remedies Act (CLRA) (Civ. Code, § 1750 et seq.).

Target has not sought a determination by the Board of Equalization (the Board) as to whether hot coffee to go is subject to sales tax.  Instead, Target says it has paid to the Board all sales tax reimbursement collected on sales of hot coffee to go and that plaintiffs are statutorily and constitutionally barred from bringing this suit.  In response, plaintiffs argue that there is no record of whether Target has paid to the Board the sales tax reimbursement it collected on hot coffee to go and that even if Target has done so, the suit may still go forward.

One might wonder why Target would adopt such an arrangement — that is, charging its customers sales tax reimbursement on hot coffee to go and then remitting all the proceeds to the Board.  At first glance, it does not appear that Target has unjustly enriched itself, as plaintiffs contend.

But here it is important to note that the law governing whether a sale of hot coffee is subject to sales tax is remarkably complex.  Section 6359 generally exempts from sales taxes "the sale of . . . food products for human consumption." (§ 6359, subd. (a).)  The term "food products" is defined to include "coffee."

2

(§ 6359, subd. (b)(1)).  But the statute provides that this exemption does not apply "[w]hen the food products are served as meals on or off the premises of the retailer" (§ 6359, subd. (d)(1)) or "are furnished, prepared, or served for consumption at tables, chairs, or counters . . . ."  (§ 6359, subd. (d)(2)).  Further, the sales tax exemption does not apply "[w]hen the food products are ordinarily sold for immediate consumption on or near a location at which parking facilities are provided primarily for the use of patrons in consuming the products purchased at the location, even though those products are sold on a 'take out' or 'to go' order and are actually packaged or wrapped and taken from the premises of the retailer." (§ 6359, subd. (d)(3).)  The exemption also does not apply "[w]hen the food products sold are furnished in a form suitable for consumption on the seller's premises, and both of the following apply:  [¶] (A) Over 80 percent of the seller's gross receipts are from the sale of food products.  [¶] (B) Over 80 percent of the seller's retail sales of food products are sales subject to tax . . . ."  (§ 6359, subd. (d)(6).)  And the exemption does not apply "[w]hen the food products are sold as hot prepared food products," although sales of "beverages (other than bouillon, consommé, or soup)" are exempt.  (§ 6359, subds. (d)(7), (e).)  Finally, California Code of Regulations, title 18, section 1603, subdivision (c)(1)(B) provides that the sale of hot coffee "on a 'take-out' or 'to go' order" by a seller that does not satisfy the "80-80" criteria described in subdivision (d)(6) of section 6359 is not subject to sales tax.

Thus, some sales of hot coffee are likely subject to sales tax while other sales are not.  The key point is that sorting all this out would be quite onerous for Target.  As the Board explains in its amicus brief, "the overhead expenses Target would incur in order to differentiate 'to go' sales from in-store sales could be quite large. . . .  Target would have to distinguish sales of coffee where the customer bought the coffee and immediately left the store from those where the customer

3

bought the coffee but continued to shop in the same store or drank the coffee at tables and chairs in the coffee sales area.  In addition, since the analysis must be made on a location-by-location basis, Target would need to conduct investigations in each of its California locations.  [Citation.]  The amount of administrative expense incurred to obtain such figures and maintain proper records would likely be passed on to Target's customers in the form of higher prices."

Rather than keep track of what its customers do with each cup of hot coffee to go, it is far simpler and less costly for Target to collect sales tax reimbursement on every sale and remit those amounts to the Board.  In so doing, Target gains the advantage of advertising its coffee at a lower price before adding to each sale a charge for what it represents as sales tax.

Of course, Target is not required to take advantage of any sales tax exemption (see §§ 6905, 6933 [taxpayer's failure to bring timely claim to recover overpayment "constitutes a waiver"]), and Target may understandably believe that the burden of maintaining relevant records and proving the exemption's applicability to particular transactions is not worth the benefit (see maj. opn., *ante*, at pp. 22, 53–54).  Moreover, it is possible that consumers end up paying less for hot coffee to go than if Target were to track each cup of coffee and pass the administrative costs on to its customers.

But none of this speaks to whether a retailer may represent to its customers that it is collecting sales tax on a transaction when the transaction is not actually subject to sales tax.  That is the unlawful business practice alleged here.  For both Target and its customers, it may be more efficient for Target not to incur the cost of tracking each cup of coffee.  But as the court acknowledges (maj. opn., *ante*, at p. 41, fn. 11), this efficiency need not come at expense of misleading consumers as to what they are paying for.  Target could have avoided this lawsuit simply by advertising hot coffee to go at a higher (post-tax) price with a sign that says "all

4

prices include applicable sales tax." Such an approach would not misinform customers; it would tell them that the price they are paying includes any *applicable* sales tax, with no representation as to whether sales tax was applicable to a particular transaction. Indeed, the Board has informally advised Target to use this approach to avoid future problems. But it is evident that this approach would eliminate the competitive advantage that Target enjoys from its current practice of advertising its coffee at a lower (pre-tax) price and then adding sales tax to each sale, whether or not each sale is actually subject to sales tax.

## II.

The court today holds that a customer has no judicial recourse to challenge this arrangement because only the retailer, who is the taxpayer, can seek an official determination of whether sales tax is actually owed. According to the court, the customer's only recourse is to politely ask the Board to consider the issue, even though no law requires the Board to resolve the issue upon a consumer's request. The upshot is that Target, which has every reason to avoid administrative costs and keep its advertised prices low, will have no incentive to seek an official determination so long as it remits all of the sales tax reimbursement it collects to the Board. And the Board has little incentive to question whether the amount of tax revenue it receives from Target is too much. The customer is the only one harmed. The customer is the only one with a reason to compel an official determination of whether Target has misled the public by purporting to collect reimbursement for sales taxes that it does not actually owe.

Today's opinion does not really dispute that telling customers they are being charged for sales tax when no sales tax applies is an unlawful business practice within the meaning of the UCL and CLRA. Instead, the court holds that no consumer may invoke the UCL or CLRA to seek an adjudication of the issue because the tax laws do not allow it. The court's expansive discussion of the tax

5

laws boils down to two claims, one specific and one general:  First, section 6901.5 provides a safe harbor for retailers who collect excess sales tax reimbursement and remit the excess amount to the Board.  Upon reaching this safe harbor, "the retailer's obligations are at an end." (Maj. opn., *ante*, at p. 40.)  Second, "the tax code contemplates that the method by which the *taxability of a sale* may be challenged and determined is through an audit or deficiency determination made by the Board, or through a taxpayer's refund claim before the Board, followed by judicial review of the Board's decision." (*Id.* at p. 51.)  Any other process, the court says, would undermine the orderly administration of the tax laws. (*Id.* at p. 56.)  Neither claim is persuasive.

## A.

The court acknowledges, as it must, that the UCL and CLRA provide "broad" protection for consumers against unfair business practices. (Maj. opn., *ante*, at p. 48; see *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 181 (*Cel-Tech*) [UCL's " 'broad, sweeping language' " was intended " 'to permit tribunals to enjoin on-going wrongful business conduct in whatever context such activity might occur' " and " 'precisely to enable judicial tribunals to deal with the innumerable " 'new schemes which the fertility of man's invention would contrive' " ' "]; *Broughton v. Cigna Healthplans of California* (1999) 21 Cal.4th 1066, 1077 ["The CLRA was enacted in an attempt to alleviate social and economic problems stemming from deceptive business practices . . . ."]; Civ. Code, § 1760 [CLRA "shall be liberally construed and applied to promote its underlying purposes"].)  In her amicus brief, the Attorney General notes that she "receives thousands of complaints each year and is not in a position to investigate and prosecute all of them.  Legitimate actions by private litigants are necessary to supplement law enforcement efforts and to vindicate consumers' rights."

6

Our case law holds that "[w]hen specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." (*Cel-Tech*, *supra*, 20 Cal.4th at p. 182.) But we have made clear that "[t]o forestall an action under the unfair competition law, another provision must actually 'bar' the action or clearly permit the conduct." (*Id.* at p. 183.) The court does not contend that any provision actually bars plaintiffs' lawsuit. Instead, it contends that section 6901.5 clearly permits the allegedly unlawful conduct.

The plain text of the statute refutes the court's thesis. Section 6901.5 says, in pertinent part: "When an amount represented by a person to a customer as constituting reimbursement for taxes due under this part is computed upon an amount that is not taxable or is in excess of the taxable amount and is actually paid by the customer to the person, the amount so paid shall be returned by the person to the customer upon notification by the Board of Equalization or by the customer that such excess has been ascertained. In the event of his or her failure or refusal to do so, the amount so paid, if knowingly or mistakenly computed by the person upon an amount that is not taxable or is in excess of the taxable amount, shall be remitted by that person to this state."

In the sales tax scheme, this language establishes that " '[i]f tax reimbursement in excess of the tax liability on a transaction is collected and paid to the State, the taxpayer has no further tax liability . . . .' " (Maj. opn., *ante*, at p. 39.) But the fact that the retailer has no further *tax* liability does not mean it is immunized from liability under the consumer protection statutes. Remitting excess sales tax reimbursement to the state simply forestalls any tax dispute between the retailer and the Board. It does not forestall a dispute between the retailer and its customers over unlawful business practices. Plaintiffs in this case are not suing for a tax refund; they are suing to prevent and remedy misrepresentations that induce customers to reimburse Target for sales tax on

7

transactions for which no sales tax is actually owed.  The fact that Target may have reached a safe harbor with respect to any audit or enforcement action by the Board does not give Target permission to tell its customers that certain charges are sales taxes when in fact they are not.  I do not see how section 6901.5 permits, much less "clearly permit[s]" (*Cel-Tech*, *supra*, 20 Cal.4th at p. 183), this conduct. Indeed, among the many arguments the Board makes in its amicus brief urging dismissal of this suit, the Board nowhere contends that section 6901.5 provides an all-purpose safe harbor of the sort that today's decision invents.

### B.

The court's more general argument is that allowing plaintiffs' suit to go forward will undermine the orderly administration of the tax laws.  The court relies on the familiar precepts, codified in article XIII, section 32 of the California Constitution and related statutory provisions, that only a taxpayer can seek recovery of an overpayment, that a taxpayer must first pay the tax before disputing it, and that a taxpayer seeking a refund must first exhaust administrative remedies before going to court.  But plaintiffs' lawsuit does not run afoul of these precepts because it is not a tax refund action.  Nor is it an action to compel Target to seek a refund or claim a tax exemption, or to compel the Board to provide a refund, or to prevent or enjoin the Board from collecting any tax.  This is an ordinary consumer action that seeks to remedy a retailer's practice of misinforming consumers as to the taxability of particular sales.

Because the court cannot point to any law that actually bars this lawsuit or clearly permits the alleged misconduct, it must ultimately resort to considerations of policy.  Thus, the court says that allowing this suit to go forward will lead to adjudication of tax questions "without the benefit of the Board's expertise or its ability to conserve judicial resources by correcting error by means of administrative proceedings" (maj. opn., *ante*, at p. 56), "could produce

8

inconsistent judgments" between courts or between a court and the Board (*id.* at p. 55), and "could threaten revenue collection and the ability of government to plan for expenditures" (*id.* at p. 56). These concerns flow from the premise that the Board "would be absent" from any consumer litigation and thus will not have had any chance to reach its own determination on the taxability question before a court issues a judgment. (*Id.* at p. 54.)

But there is a simple solution for this: In any civil action, a court "shall" join as a party a person who "claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest." (Code Civ. Proc., § 389, subd. (a).) Today's opinion acknowledges that the Board is "a party considered by the Legislature to be necessary" in "a proceeding that would produce a binding interpretation of tax law." (Maj. opn., *ante*, at p. 54.) Why isn't joinder of the Board an adequate response to the concerns that the court has identified?

There is no reason to think that the Board would be reluctant to participate as a party or that a court would be reluctant to join the Board. In this case, the Board has filed a lengthy amicus brief defending its prerogative to decide the taxability question at issue. If plaintiffs' suit were to go forward, presumably the Board would not hesitate to be joined as a party. Joining the Board would not run afoul of the state Constitution because plaintiffs do not seek "to prevent or enjoin the collection of any tax." (Cal. Const., art. XIII, § 32.) In the course of the proceeding, the Board would provide its determination of when hot coffee to go is subject to sales tax, and the court would have the benefit of the Board's expertise before rendering a judgment.

9

Suppose the court decides that Target has overpaid its taxes. Target would then be required to return any overcharges to its customers and to avoid future misrepresentations. Going forward, Target may choose to distinguish taxable from nontaxable sales of hot coffee, and it may seek a refund of any excess sales taxes it remitted to the Board. But Target need not do so if it believes the administrative costs outweigh the benefits. As noted, Target can elect to keep paying sales tax on all sales of hot coffee to go while passing the cost on to consumers by charging higher prices with a sign that says "all prices include applicable sales tax." The decision whether to utilize an exemption or seek a refund is entirely up to Target. Further, plaintiffs have not sought any remedy from the Board, and the burden is on Target, not the Board, to initiate the refund process. (§ 6091.) I do not see how such a procedure would undermine the orderly administration of the tax laws any more than judicial review of a Board decision on the same question in an audit, deficiency determination, or refund action.

The court distinguishes *Javor v. State Board of Equalization* (1974) 12 Cal.3d 790 (*Javor*) on the ground that compulsory joinder of the Board in that case served to allow the "retailers to make refund applications to the Board" and to enable "the Board to respond to these applications by paying into court all sums, if any, due defendant retailers." (*Id.* at p. 802; see maj. opn., *ante*, at pp. 13, 60.) But nothing in *Javor* indicates that this remedial approach is exclusive of all others. Today's opinion, unlike *Javor*, leaves consumers who have been charged sales tax reimbursement on nontaxable sales with no judicial recourse at all, even as it makes no attempt to explain why joinder of the Board would not adequately protect the interests of the Board, retailers, and the public in the orderly administration of the tax laws.

Finally, the court says that "independent consumer claims against retailers for restitution of reimbursement charges on nontaxable sales could form a huge volume of litigation over all the fine points of tax law as applied to millions of daily commercial transactions in this state." (Maj. opn., *ante*, at p. 56.) This would be true only if consumers often had cause to suspect retailers of misrepresenting the applicability of the sales tax to particular items. But there is no reason to believe this is so. Before today's decision, no authority foreclosed suits like this one, yet there is no indication that such suits are common. This case seems unusual because some sales of hot coffee are taxable while others are not. Neither the court, the Board, nor Target contends that a similar ambiguity affects the taxability of many other items. With no evident basis for concern, the court's warning of a flood of litigation is a mere makeweight.

## III.

This case is really quite straightforward. Plaintiffs allege an unlawful business practice that lies squarely within the broad language and policy objectives of the UCL and CLRA. No statute bars this action, and no law clearly permits the allegedly unlawful conduct. Plaintiffs' suit implicates a taxability question. But judicial resolution of the question, with the Board joined as a party, presents no greater threat to the orderly administration of the tax laws than judicial review of a Board determination addressing the same question. The lengthy disquisition on our tax laws in today's opinion suggests a category error: The court has mistaken an ordinary consumer action that involves a tax question for a tax refund suit that precludes an ordinary consumer action.

The court's ruling, though erroneous, need not be read to broadly establish that a consumer action may never go forward if it involves a tax issue. This case implicates a rather arcane and complicated question of taxability. Future cases may implicate tax questions that are distinguishable from the one at issue here. In

11

light of California's strong legislative policy against deceptive business practices, courts should hesitate to expand the hole that today's decision carves out of our consumer protection statutes.

Because of today's ruling, we may never know when hot coffee to go is actually subject to sales tax because neither a retailer nor the Board has any incentive to resolve the issue.  That in itself is no great travesty.  But why should a retailer be allowed to misrepresent to consumers that all sales of a particular item are subject to sales tax when in fact they are not?  A consumer who seeks her day in court to contest this misrepresentation is simply out of luck, while the retailer and the Board stay mum and mutually benefit.  Nothing in the tax laws or our precedents authorizes such a questionable arrangement, and our robust consumer protection statutes are not so easily defeated.

I respectfully dissent.


LIU, J.


WE CONCUR:   WERDEGAR, J.
                         MOORE, J.*

---

* Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Loeffler v. Target Corporation
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 173 Cal.App.4th 1229
**Rehearing Granted**
_____

**Opinion No.** S173972
**Date Filed:** May 1, 2014
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Michael L. Stern
_____

**Counsel:**

Law Office of Joseph J. M. Lange, Joseph J. M. Lange Law Corporation, Joseph J. M. Lange; Public Justice, Leslie A. Bailey, Victoria W. Ni, Arthur H. Bryant; Lange & Koncius, Kiesel Boucher & Larson, Kiesel + Larson and Jeffrey A. Koncius for Plaintiffs and Appellants.

Mastroianni Law Firm and A. Douglas Mastroianni for Jason Frisch as Amicus Curiae on behalf of Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, Frances T. Grunder, Assistant Attorney General, Gordon Burns, Deputy State Solicitor General, Kathrin Sears and Alexandra Robert Gordon, Deputy Attorneys General, for Attorney General of State of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Barry D. Keene; Nossaman and William T. Bagley as Amici Curiae on behalf of Plaintiffs and Appellants.

J. Bruce Henderson for the Association of Concerned Taxpayers as Amicus Curiae on behalf of Plaintiffs and Appellants.

The Kick Law Firm, Taras Kick, Thomas A. Segal, Matthew E. Hess, Graig Woodburn and G. James Strenio for Michael McClain, Avi Feigenblatt and Gregory Fisher as Amici Curiae on behalf of Plaintiffs and Appellants.

Harvey Rosenfield, Pamela Pressley and Todd M. Foreman for Consumer Watchdog, Public Good, Consumeraffairs.com and National Association of Consumer Advocates as Amici Curiae on behalf of Plaintiffs and Appellants.

Thorsnes Bartolotta McGuire and Benjamin I. Siminou for Carmen Herr, Heidi Spurgin, Mark Hegarty and Joseph Thompson as Amici Curiae on behalf of Plaintiffs and Appellants.

**Page 2 – counsel continued – S173972**

**Counsel:**

Morrison & Foerster, Miriam A. Vogel, David F. McDowell and Samantha P. Goodman for Defendant and Respondent.

Reed Smith, Margaret M. Grignon, Douglas C. Rawles and Judith E. Posner for Rite Aid Corp. and Walgreen Co. as Amici Curiae on behalf of Defendant and Respondent.

Holland & Knight and Richard T. Williams for CVS Caremark Corp. and CVS Pharmacy, Inc., as Amici Curiae on behalf of Defendant and Respondent.

Hunton & Williams and Phillip J. Eskenazi for Albertson's Inc., as Amicus Curiae on behalf of Defendant and Respondent.

Wilson Turner Kosmo, Frederick W. Kosmo, Jr., and Theresa Osterman Stevenson for PETCO Animal Supplies Stores, Inc., as Amicus Curiae on behalf of Defendant and Respondent.

Kristine Cazadd, Robert W. Lambert and John L. Waid for California State Board of Equalization as Amicus Curiae on behalf of Defendant and Respondent.

Alston & Bird, Andrew E. Paris, Ethan D. Millar and Joann M. Wakana for DIRECTV Inc., as Amicus Curiae on behalf of Defendant and Respondent.

Edmund G. Brown, Jr., Attorney General, David S. Chaney and Matt Rodriquez, Chief Assistant Attorneys General, and Al Shelden, Deputy Attorney General, as Amici Curiae.

Letwak & Bennett and Stephen H. Bennett as Amici Curiae.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Leslie A. Bailey
Public Justice
555 Twelfth Street, Suite 1230
Oakland, CA  94607
(510) 622-8150

David F. McDowell
Morrison & Foerster
707 Wilshire Boulevard, Suite 6000
Los Angeles, CA  90017-3543
(213) 892-5200